No. 24-1059 (consolidated with 24-1054)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF OKLAHOMA, STATE OF WEST VIRGINIA,
STATE OF ARKANSAS, *ET AL.*,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,

*Respondents.*

## PETITIONERS' MOTION TO STAY

| | |
|---|---|
| GENTNER DRUMMOND<br>  ATTORNEY GENERAL | PATRICK MORRISEY<br>  ATTORNEY GENERAL |
| Garry M. Gaskins, II<br>  *Solicitor General*<br>Jennifer L. Lewis<br>  *Deputy Attorney General* | LINDSAY S. SEE<br>  *Solicitor General*<br>MICHAEL R. WILLIAMS<br>  *Principal Deputy Solicitor General* |
| OFFICE OF THE ATTORNEY<br>GENERAL OF OKLAHOMA<br>313 NE Twenty-First St.<br>Oklahoma City, OK 73105<br>Phone: (405) 521-3921<br>Fax: (405) 521-6246<br>garry.gaskins@oag.ok.gov<br>jennifer.lewis@oag.ok.gov | OFFICE OF THE WEST VIRGINIA<br>ATTORNEY GENERAL<br>1900 Kanawha Blvd., East<br>Building 1, Room E-26<br>Charleston, WV 25305<br>Phone: (304) 558-2021<br>lindsay.s.see@wvago.gov<br>michael.r.williams@wvago.gov |
| *Counsel for State of Oklahoma* | *Counsel for State of West Virginia* |

[additional counsel listed after signature page]

# TABLE OF CONTENTS

Table of Authorities ............................................................................... ii

Glossary ............................................................................................... vi

Introduction ........................................................................................... 1

Statement Of The Case .......................................................................... 1

I.    Emission Regulation Under Section 111 Generally ................................. 1

II.    Regulating Oil and Gas Under Section 111 ........................................... 3

Argument ............................................................................................... 6

I.    The States are likely to succeed on the merits ...................................... 6

    A.    The Rule destroys the CAA's cooperative-federalism framework ................................................................................. 7

    B.    The Rule arbitrarily and capriciously gives States just two years to submit plans ..................................................... 11

II.    The States will suffer irreparable harm without a stay .......................... 15

III.    The other factors favor a stay .............................................................. 19

Conclusion ............................................................................................ 21

Certificate Of Compliance ..................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
    138 S.Ct. 2305 (2018) ..................................................18

*Amerijet Int'l Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014)................................11

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ...................................6

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    410 U.S. 402 (1971)..................................................12

*Com. of Pa., by Shapp v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976)..................................18

*Common Cause v. FEC*,
    692 F. Supp. 1391 (D.D.C. 1987) ............................11

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985)....................................6

*District of Columbia v. Train*,
    521 F.2d 971 (D.C. Cir. 1975)....................................9

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v.
    EPA*,
    94 F.4th 77 (D.C. Cir. 2024) .....................................2

*Essex Chem. Corp. v. Ruckelshaus*,
    486 F.2d 427 (D.C. Cir. 1973)....................................3

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life
    Ins.*,
    588 F. Supp. 2d 919 (S.D. Ind. 2008)......................20

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ...............................18

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ...............................18, 20

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*La. Pub. Serv. Comm'n v. FERC,*
   860 F.3d 691 (D.C. Cir. 2017)....................................................................10

*Lignite Energy Council v. EPA,*
   198 F.3d 930 (D.C. Cir. 1999)......................................................................3

*Michigan v. EPA,*
   213 F.3d 663 (D.C. Cir. 2000)......................................................................9

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001)....................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983)......................................................................................11

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
   783 F.3d 1301 (D.C. Cir. 2015)....................................................................1

*Nat'l Min. Ass'n v. EPA,*
   59 F.3d 1351 (D.C. Cir. 1995)....................................................................11

*Nat'l-Southwire Aluminum Co. v. EPA,*
   838 F.2d 835 (6th Cir. 1988)........................................................................7

*New York v. Microsoft Corp.,*
   209 F. Supp. 2d 132 (D.D.C. 2002) ...........................................................18

*Nken v. Holder,*
   556 U.S. 418 (2009)......................................................................................6

*Portland Cement Ass'n v. Train,*
   513 F.2d 506 (D.C. Cir. 1975)......................................................................3

*R.I.L-R v. Johnson,*
   80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................20

*Safe Extensions, Inc. v. FAA,*
   509 F.3d 593 (D.C. Cir. 2007)....................................................................12

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981)......................................................................3

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Sierra Club v. Ga. Power Co.,*
  180 F.3d 1309 (11th Cir. 1999).........................................................20

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016).............................................................17

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994)...........................................................................17

*Train v. Nat. Res. Def. Council, Inc.,*
  421 U.S. 60 (1975)...............................................................................7

*Tri-State Generation & Transmission Ass'n v. Shoshone River
  Power, Inc.,*
  805 F.2d 351 (10th Cir. 1986).........................................................20

*Virginia v. EPA,*
  108 F.3d 1397 (D.C. Cir. 1997)..........................................................9

*W. Coal Traffic League v. United States,*
  677 F.2d 915 (D.C. Cir. 1982)..........................................................13

*West Virgina v. EPA,*
  597 U.S. 697 (2022)..............................................................................7

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).................................................................................6

*Withrow v. Williams,*
  507 U.S. 680 (1993)...........................................................................20

*Xiaomi Corp. v. Dep't of Def.,*
  No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...................15

## Statutes

42 U.S.C. § 7416 ...................................................................................11

42 U.S.C. § 7401 ..............................................................................1, 7

42 U.S.C. § 7410 ........................................................................7, 9, 13

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

42 U.S.C. § 7411 ...................................................... 1, 2, 3, 7, 9, 11, 12, 17

Col. Rev. Stat. § 25-7-102 ........................................................... 19

Va. Code § 45.2-1706.1 ........................................................... 19

## Other Authorities

40 C.F.R. pt. 60, subpt. KKK (2012) ...................................................... 4

44 Fed. Reg. 49,222 (Aug. 21, 1979) ...................................................... 3

81 Fed. Reg. 35,824 (June 3, 2016) ...................................................... 4

85 Fed. Reg. 57,018 (Sept. 14, 2020) ...................................................... 4

86 Fed. Reg. 63,110  (Nov. 15, 2021) ...................................................... 9

87 Fed. Reg. 74,702 (Dec. 6, 2022) ...................................................... 19

89 Fed. Reg. 16,820 (Mar. 8, 2024) ........................... 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,
13, 14, 15, 17, 18, 19, 20, 21

Kevin Cramer,
   *Restoring States' Rights & Adhering to Cooperative*
   *Federalism in Environmental Policy*,
   45 HARV. J.L. & PUB. POL'Y 481 (2022) ........................................................... 2

# GLOSSARY

CAA .......................................................................................Clean Air Act

EPA ................................................................. Environmental Protection Agency

VOC ............................................................... volatile organic compound

# INTRODUCTION

Petitioners—24 States and one state legislature—move to stay the Environmental Protection Agency's final rule, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) ("Rule"). The States also ask that the Court administratively stay the Rule while this motion is pending.

In the Rule, EPA imposes onerous new requirements on the oil and gas industries related to methane and other volatile organic compounds (or "VOCs"). The Rule will impose millions of dollars of costs on the States, and those costs are starting to tally up right now. Yet the Rule is legally unsound. It unlawfully deprives States of the discretion that Congress granted them. And it holds the States to a two-year deadline that will prove impossible to meet.

The Rule's sweeping reordering of our nation's oil and gas industries deserves appropriate review. The Court should stay this Rule pending Petitioners' legal challenge.

## STATEMENT OF THE CASE

### I.    Emission Regulation Under Section 111 Generally

"The Clean Air Act is an exercise in cooperative federalism." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317 (D.C. Cir. 2015) (cleaned up). It recognizes that air pollution prevention and control "is the primary responsibility of States and local governments." 42 U.S.C.

1

§ 7401(a)(3).  And it affords "each state leeway to select means" for controlling pollution that are "consistent with its particular circumstances and priorities." *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*, 94 F.4th 77, 93 (D.C. Cir. 2024).  Meanwhile, the federal government merely "acts as a backstop."  Kevin Cramer, *Restoring States' Rights & Adhering to Cooperative Federalism in Environmental Policy*, 45 HARV. J.L. & PUB. POL'Y 481, 486–87 (2022).

Section 111 of the Act is no exception.  To be sure, Section 111 requires EPA to make some initial judgments.  The agency identifies source categories to be regulated.  42 U.S.C. § 7411(b).  It then determines a "best system of emission reduction" for those sources.  *Id.* § 7411(a)(1).  Lastly, it establishes "standards of performance" in line with that system for "emissions of air pollutants" from new sources in those categories.  *Id.* § 7411(a)(1), (b).  But once those tasks are done, the States must step in and develop "plans" setting their own "standards of performance" for existing sources.  *Id.* § 7411(d)(1). These state-developed plans should "reflect[]" the "degree of emission limitation achievable" through the EPA-identified "best system."  *Id.* § 7411(a)(1).  But EPA must permit States discretion to tailor standards for source-specific considerations like the facility's "remaining useful life."  *Id.* § 7411(d)(1).  And EPA may directly regulate existing sources only if a State fails to submit or enforce a "satisfactory plan."  *Id.* § 7411(d)(2).  Even for new sources, States can "develop and submit to [EPA] a procedure for implementing and enforcing standards of performance"; if the plan is

"adequate," the State takes over implementation and enforcement.   *Id.*
§ 7411(c)(1).

EPA also faces some key limits on its own discretion in setting standards
of performance for new sources and identifying the "best systems" that drive
them.   Among other things, standards of performance must "tak[e] into
account the cost of achieving [any] such [emission] reduction and any nonair
quality health and environmental impact and energy requirements"     42
U.S.C. § 7411(a)(1).  Likewise, the best system of emission reduction must be
"adequately demonstrated."   *Id.*    These provisions prevent EPA from
mandating measures that impose "exorbitant," "unreasonable," or "excessive"
costs.  *Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999);
*Sierra Club v. Costle*, 657 F.2d 298, 383 (D.C. Cir. 1981).  EPA cannot cause
expense "greater than the [regulated] industry could bear and survive."
*Portland Cement Ass'n v. Train*, 513 F.2d 506, 508 (D.C. Cir. 1975).  Methods
must be "reasonably reliable, reasonably efficient, and … reasonably …
expected to serve the interests of pollution control without becoming
exorbitantly costly in an economic or environmental way." *Essex Chem. Corp.
v. Ruckelshaus,* 486 F.2d 427, 433 (D.C. Cir. 1973).

## II.    Regulating Oil and Gas Under Section 111

Although EPA issued the Rule recently, it traces its roots to 1979.  Back
then, as CAA Section 111(f) requires, EPA published a list of source categories
for which EPA would promulgate standards of performance; the list included
"Crude Oil and Natural Gas Production."   42 U.S.C. § 7411(f); 44 Fed. Reg.

3

49,222 (Aug. 21, 1979).  EPA then promulgated a few targeted rules for specific types of emissions from certain specific facilities in that category.  *See* 40 C.F.R. pt. 60, subpt. KKK (2012).  But for decades, EPA never tried to regulate methane emissions directly.

EPA's almost 40-year indifference toward methane emissions ended in 2016.  For the first time, EPA sought to directly regulate methane emissions from oil and gas facilities (along with certain other greenhouse gases and VOCs).  81 Fed. Reg. 35,824 (June 3, 2016) ("2016 Rule").  It also reached transmission and storage, even though the 1979 category referred to only "production."

Several States challenged the 2016 Rule.  *See, e.g.*, *West Virginia v. EPA*, No. 16-1264 (D.C. Cir. filed Aug. 2, 2016); *North Dakota v. EPA*, No. 16-1242 (D.C. Cir. filed July 15, 2016).  This Court then held the consolidated cases in abeyance to allow the agency time to reconsider.  Eventually, EPA did: in a 2020 rule, it reverted to many of its original interpretations.  85 Fed. Reg. 57,018 (Sept. 14, 2020) ("2020 Rule").  Unfortunately, this regime of renewed respect for the statute was short-lived, as President Biden signed a joint resolution that disapproved of the 2020 Rule under the Congressional Review Act.

The Rule at issue here amounts to EPA's third bite at the apple—and it may be the worst yet.  *See* 89 Fed. Reg. 16,820 (Mar. 8, 2024).  It adopts rigid new source performance standards for both methane and VOC emissions from new oil and gas sources in the production, processing, transmission, and

4

storage segments of the industry. These standards will gravely impair the energy sector. Exhibit 1, State of W. Va. *et al.*, Comment Letter (Jan. 31, 2022); Exhibit 2, State of W. Va. *et al.*, Comment Letter (Feb. 13, 2023); Exhibit 3, The Petrol. All. of Okla. Comment Letter at 1 (Feb. 13, 2023). The Rule further commands States to issue plans for implementing standards of performance for existing sources in those same categories within two years. 89 Fed. Reg. at 16,978. EPA further included a set of "presumptive standards" for the States that cabin the States' discretion—EPA will "thoroughly review[]" any deviation. *Id.* at 16,829, 17,006. EPA also warned States against considering "remaining useful life of the facility" in several circumstances—in direct contravention of the statute. *See, e.g.*, *id.* at 17,004. And it creates a new extra-statutory "super emitter" program under which third parties are deputized to investigate methane-release events on their own. *Id.* at 16,876-81.

The Rule has spurred new challenges. Texas and two of its agencies petitioned for review on March 8. Petitioners here filed on March 12. The Court has since consolidated the two actions. An industry entity has also moved for leave to intervene and oppose the Rule.

Recognizing that the States would suffer harm before this judicial-review process played out, Oklahoma requested a stay from EPA Administrator Michael Regan in March 2024. Exhibit 4, Letter from Garry M. Gaskins, II, Solicitor General of Okla., to Michael S. Regan Admin. of the EPA (Mar. 25, 2024). The letter explained that the Rule would hamstring the

States' ability to consider differences between new and existing sources, place enormous and immediate regulatory burdens on the States, and damage the energy field by ignoring the regulated industries' complexity. *Id.* EPA never responded.

## ARGUMENT

To secure a stay, the States must show (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without a stay, (3) a stay will not substantially injure other interested parties, and (4) the public interest favors a stay. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors are "the most critical," while the third and fourth merge here. *Nken v. Holder*, 556 U.S. 418, 434-35 (2009). In some cases, the Court has said that the "[p]robability of success is inversely proportional to the degree of irreparable injury evidenced," so a strong showing on one can overcome a weaker showing on the other. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *but see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (noting this may be an open question after *Winter*).

The exceptional circumstances here satisfy all the requirements for a stay.

## I.    The States are likely to succeed on the merits.

The Rule suffers from many legal flaws. For now, it's enough to highlight two—(1) EPA's unlawful choice to destroy State discretion and (2)

its arbitrary and capricious choice to give the States just two years to implement this scheme.

### A. The Rule destroys the CAA's cooperative-federalism framework.

Section 111—and particularly Section 111(d)—gives States the lead role in implementation. *See Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001) (explaining that EPA's "overarching role" in the CAA "is in setting standards, not in implementation"); *Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 838 (6th Cir. 1988) ("[Section 111(d)] gives substantial latitude to the states in setting emission standards for welfare-related pollutants generated by local facilities."). Congress said from the beginning that preventing and controlling air pollution—the CAA's fundamental goal—"is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Reflecting that sense, CAA Section 111(d) provides that "the States set the actual rules governing existing" sources. *West Virginia v. EPA*, 597 U.S. 697, 710 (2022); *see* 42 U.S.C. § 7411(d). Because Section 111(d) "relegate[s]" EPA "to a secondary role," *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975), EPA can jump in only if a state-submitted plan does not "meet[] all of the applicable requirements" of the CAA, 42 U.S.C. § 7410(k)(3); *see also id.* § 7410 (providing that plan submission under Section 111(d) is to be "similar to that provided by section 7410").

The Rule abandoned this cooperative-federalism framework in several ways.

7

Take the "presumptive standards." 89 Fed. Reg. at 16,828. Rather than merely identifying the best system of emission reduction, the Rule sets emission guidelines that would purportedly result from the application of those standards *and then* lists out specific technologies and methods that should be employed to hit the guidelines (or targets). *Id.* at 16,833-35. It also presumptively requires States to adopt an extra-statutory Super Emitter Program, wherein third parties are empowered to monitor and report emissions by covered facilities on their own. *Id.* at 16,828. And it emphasizes that States should include *all* the presumptions, not just some. *Id.* at 17,005. Appeasing EPA is crucial, as EPA further declares that it must find state plans "satisfactory" (based on its own sense) before approving them. *Id.* at 17,007.

Although EPA insists that these "presumptions"—a concept nowhere addressed in the statute—are different from direct regulation, it concedes that the agency will use those same presumptions in shaping its own federal standards, if necessary. *Id.* at 16,829 n.21. Any State that takes a different path will be "thoroughly reviewed." 89 Fed. Reg. at 17,006. Among other things, States that prefer a different route must follow a distinct and rigorous three-step "equivalency" approval process. *Id.* at 16,996. And a "state's standards of performance" must be "no less stringent" than the "presumptive standard." *Id.* at 16,829; *see also id.* at 16,848. No wonder, then that the EPA ominously warned at the proposed-rule stage that "it would likely be difficult for States to demonstrate that the presumptive standards are not reasonable

for the vast majority of designated facilities."  86 Fed. Reg. 63,110, 63,251 (Nov. 15, 2021).

None of these faux presumptions are acceptable.  Especially with the artificial time constraints involved (discussed more below), the plain import is to push States into hastily accepting the presumptive standards.  Yet EPA may not "condition approval of a state's implementation plan on the state's adoption of a particular control measure." *Virginia v. EPA*, 108 F.3d 1397, 1415 (D.C. Cir. 1997) (discussing CAA Section 110); *see also* 42 U.S.C. § 7411(d)(1) (explaining that Section 111(d) plan submission should follow procedures like those used in Section 110).  And having left the States with no "*real* choice with regard to the control measure options available to them," EPA has impermissibly intruded on the States' right to fashion their own plans. *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000) (emphasis added). These presumptions functionally "commandeer the regulatory powers of the states." *District of Columbia v. Train*, 521 F.2d 971, 992 (D.C. Cir. 1975), *vacated on other grounds*, *EPA v. Brown*, 431 U.S. 99 (1977).

Things get no better when it comes to Section 111's command that States be permitted to consider the remaining useful life of a facility, along with other facility-specific factors, in developing standards of performance.  To limit that discretion, EPA has written in several more factors that States must meet. States must now show "unreasonable cost," "physical impossibility," and similarly tough facts to justify invoking their discretion.  89 Fed. Reg. at 17,002.  States must also identify "fundamental differences" between the

9

information available to the States and the information that was available to the EPA; if EPA and the States draw different conclusions from the same body of data, EPA's judgment automatically prevails—even though the statute contemplates the opposite. *Id.*; *but see, e.g.*, *La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 693 (D.C. Cir. 2017) (noting how different agencies using different methodologies might reach different conclusions about remaining useful life of a facility). And for some facilities, EPA essentially erases "remaining useful life" as a consideration altogether, confining it to situations where EPA's "presumptive standards" would involve a "significant capital investment." *Id.* at 17,004. All these atextual limits on state authority offend the CAA.

New limits on when certain state permits can substitute for federal oversight undermine federalism, too. For a long while, a tank battery has not been considered a covered facility if it is subject to a "legally and practicably enforceable [emission] limit" under state law. 89 Fed. Reg. at 16,897. But in the Rule, EPA imposed new criteria that make it difficult to invoke such a limit anymore. *Id.* at 16,973-79. If state standards don't meet EPA's rigid criteria, then EPA ignores them. This approach "starts from a place of skepticism [toward state law], effectively assuming [EPA] can supplant any state regulation that EPA considers inadequate based solely on its own disagreement." Exhibit 1, State of W. Va., *et al.*, Comment Letter at 5 (Jan. 31, 2022); *see also* 89 Fed. Reg. at 16,999 (refusing to consider certain facilities regulated under state law for purposes of "averaging" methane emission levels

10

across certain facilities). State law is functionally preempted across a range of facilities. *Contra* 42 U.S.C. § 7416 (contemplating that States may "adopt or enforce any emission standard or limitation," even under Section 111, so long as it is not "less stringent than the standard or limitation under such plan or section"—full stop). "[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may—indeed must—intervene and correct the agency." *Common Cause v. FEC*, 692 F. Supp. 1391, 1396 (D.D.C. 1987). And this Court has already criticized EPA once before for "sacrific[ing]" the CAA's "statutory objective" by imposing unduly rigorous enforceability requirements on "state program[s] of unassailable effectiveness." *Nat'l Min. Ass'n v. EPA*, 59 F.3d 1351, 1364 (D.C. Cir. 1995).

These pieces and others show that the Rule dispenses with the cooperative-federalism framework that Congress demanded. The States are thus likely to succeed in showing that EPA acted without statutory authority.

## B. The Rule arbitrarily and capriciously gives States just two years to submit plans.

To survive arbitrary-and-capricious review, an agency must "set forth its reasons for decision . . . , and conclusory statements will not do." *Amerijet Int'l Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up). There must be "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (cleaned up). It must be clear that EPA considered all the

"relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 410 U.S. 402, 416 (1971).

Although the Rule reflects arbitrary-and-capricious decision-making in a few ways, an obvious one concerns the two-year deadline for submitting state plans under Section 111(d). "A large number of state commenters in addition to other commenters" warned EPA that its initial proposal to require plans within 18 months was unworkable because it would not provide enough time for States to develop plans. 89 Fed. Reg. at 17,009. In response, EPA extended that controversial period by six short months. *Id.* at 17,010. The EPA did not explain why a longer period would be inappropriate, other than to say that two years purportedly struck a "reasonable" or "appropriate" "balance." *Id.* EPA also suggested—without citing any specific evidence or examples—that "some states have adopted, or may adopt, procedures that are longer than necessary." *Id.* And EPA noted "the urgent need of climate change." *Id.*

It is bad enough that EPA cited no *evidence* in support of its rushed schedule. After all, an agency's factual determination is arbitrary when the agency "has provided absolutely no evidence to back it up." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 605 (D.C. Cir. 2007). If EPA were convinced that some States were abusing the system by employing unduly long procedures for adopting state plans, then it could have at least cited a few examples. If EPA thought that the threat of climate change were so imminent that a few additional months are off the table, then it could have found some scientific

studies saying as much.  As best the States can tell, EPA instead adopted a Goldilocks-like approach, finding a "balance" because some commenters considered the period too long and others too short.  But the Court has never endorsed this kind of rulemaking by compromise among commenters.  It'd be all the worse to do so here, where States usually have three years to develop state implementation plans under the related provisions of CAA Section 110. *See* 42 U.S.C. § 7410(a)(1).

EPA also ignored comments that painstakingly explained why two years was unrealistic for the States.  "[A]n agency decision may not be reasoned if the agency ignores vital comments regarding relevant factors, rather than providing an adequate rebuttal." *W. Coal Traffic League v. United States*, 677 F.2d 915, 927 (D.C. Cir. 1982).  And as further explained below, comments described how completing the regulatory tasks the Rule demands will take enormous time.  *See* Exhibit 5, Olds Decl. ¶14 (rough estimates being in the tens of thousands of hours of staff time); Exhibit 6, Kennedy Decl. ¶15-17; Exhibit 7, Semerad Decl. ¶16 (need to dedicate at least 4,000 hours of staff time); Exhibit 8, Bird Decl. ¶13 (hundreds of Utah Division of Air Quality staff hours above and beyond current workload); Exhibit 9, Wilkins Decl. ¶¶3-4 (imposition of an immediate burden on Montana Department of Environmental Quality, including an extreme increase in workload); Exhibit 10, Gore Decl. ¶10 (lack of state resources to implement the Rule); Exhibit 11, Crowder Decl. ¶10 (estimating 2,708 additional full-time equivalent persons would need to be hired to implement the Rule within the next two years);

13

Exhibit 12, Stegmann Decl. ¶10 (the Rule will create increased demand for 50% more existing permitting staff); Exhibit 13, Hodanbosi Decl. ¶¶10, 11, 18. Evaluating the thousands of new covered facilities (as also described below) will take time. *Id.* Applying the many multi-factor and multi-step tests found within the Rule will take even more time. *Id.* Consultation with stakeholders will require, yes, more time. *Id.* And once the state regulators have a proposed final plan, many of them will need to seek approval from a legislature, which might only meet once a year. *See, e.g.*, Exhibit 14, *The Legislative Process*, W. VA. LEGIS., https://bit.ly/3VS1EqY (last visited Apr. 10, 2024) (explaining that the West Virginia Legislature, which must approve legislative rules, meets once a year for 60 days). At the same time, the consequences for missing the deadline are dire, as anything short of a complete submission requires EPA to promulgate its own standards within a year. 89 Fed. Reg. at 17,013. So being too tough on the deadlines creates real harm.

As EPA itself was also forced to acknowledge, the Rule bakes in several new elements that will further slow the States' task. Meeting the heightened requirements for considering the remaining useful life of a facility, for instance, is no longer as simple as trusting local expertise and understanding; hyper-technical analyses are now the norm. *Id.* at 17,002-05. A shift in the way that regulators evaluate emissions—moving from throughput to component counts—will require regulators to learn a new system of assessment. *Id.* at 17,011. "Meaningful engagement" requirements are more rigorous than

14

before, and a failure to strictly comply can result in plan rejection. *Id.* at 17,006-07. And creating new permitting requirements that meet the rewritten "legally and practicably enforceable" standard will be a whole separate regulatory effort. *Id.* at 16,978.

States should have at least been given sufficient time to finish the task ahead of them.  In refusing to give them even that bit of grace, EPA acted arbitrarily and capriciously.

## II.    The States will suffer irreparable harm without a stay.

Without a stay, the States will suffer several forms of irreparable harm.

*First*, the States will suffer unrecoverable economic harm.  "[W]hen a plaintiff's alleged damages are unrecoverable, such as here, due to the sovereign immunity enjoyed by Defendants, courts have recognized that unrecoverable economic loss can indeed constitute irreparable harm." *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021).  EPA, of course, is immune.

The Rule will "require [S]tates to reduce methane emissions from hundreds of thousands of existing sources nationwide for the first time." Exhibit 18, Attachment to Johnson Decl., Utah Comment Letter dated Jan. 31, 2022, pp. 2, 11.  State after State attests to staggering figures: 200,000 wells in Oklahoma, Exhibit 12, Stegmann Decl. ¶9; 70,000 oil and gas wells in West Virginia, Exhibit 11, Crowder Decl. ¶9; 60,000 sources in Kentucky, Exhibit 6, Kennedy Decl. ¶9; tens of thousands of facilities (including 18,000 oil and gas production wells) in North Dakota, Exhibit 7, Semerad Decl. ¶12, and on and

on. *See also, e.g.*, Exhibit 13, Hodanbosi Decl. ¶¶9, 18 (51,000 well sites, not including other ancillary equipment that will also be covered); Exhibit 8, Bird Decl. ¶12 (thousands of sources will in Utah, including 2,900 oil and gas facilities, 608 permitted oil and gas minor sources, and 20 permitted oil and gas major sources); Exhibit 15, Dowd Decl. ¶9 (8,000 production wells and 75 compressor stations in Virginia) Exhibit 9, Wilkins Decl. ¶4 (1,100 oil and gas registrations in Montana); Exhibit 5, Olds Decl. ¶14 (at least 60 facilities in Alaska); Exhibit 16, Floyd Decl. ¶9 (at least 20 sources in Idaho); Exhibit 17, Thompson Decl. ¶¶11, 15 (8 compressor stations in South Carolina).

Each of these regulated facilities requires investments from the States. States with the most designated facilities will need to hire hundreds of new employees, divert limited financial resources from other state programs, or abandon their CAA obligations. *See* Exhibit 12, Stegmann Decl. ¶¶15, 16; Exhibit 11, Crowder Decl. ¶16; Exhibit 13, Hodanbosi Decl. ¶¶9, 13, 18. West Virginia alone estimates it would need to hire more than 2,700 new employees to tackle this issue. *See* Exhibit 11, Crowder Decl. ¶10. To do any of this, States will need to squeeze millions of dollars from already strained budgets. Exhibit 11, Crowder Decl. ¶10 (would cost more than $278 million annually); Exhibit 18, Johnson Decl. ¶13; Exhibit 8, Bird Decl. ¶17; Exhibit 17, Thompson Decl. ¶13; Exhibit 12, Stegmann Decl. ¶16; Exhibit 13, Hodanbosi Decl. ¶11 (Ohio EPA will need an additional $5,757,000 per year at the low level and $16,375,000 per year at the upper level); Exhibit 7, Semerad Decl. ¶¶17, 18; Exhibit 9, Wilkins Decl. ¶¶3, 4; Exhibit 6, Kennedy Decl. ¶16; Exhibit 5, Olds

16

Decl. ¶11; Exhibit 26, Owenby Decl. ¶¶14-15.  Given "the irreparable harm of nonrecoverable compliance costs," success without a stay will amount to an empty victory if those costs are spent early. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 221 (1994) (Scalia, J., concurring in part and in the judgment). But because of the short two-year window to pull plans together under the Rule, the States must begin spending this money *now*.

Beyond direct compliance costs, the Rule imposes other costs.  For example, some entities operating regulated facilities are anticipated to close because of the Rule's additional burdens.  *See, e.g.*, Exhibit 19, Comment of Indep. Petro. Assoc. of Am, *et al.* at 7-8 (Feb. 13, 2023).  Closures leave wells unmonitored.  The States will be forced to assume the task of plugging them. At the same time, the Rule forces States to burn investments already made. For instance, state agencies have dedicated staff hours and resources to promulgating and implementing states' regulatory structures based on throughput and emissions factors.  But the States will now lose some of the progress and resources developed for those regulatory structures because EPA's structure focuses more on component count. *See* Exhibit 12, Stegmann Decl. ¶¶7, 8, 10, 14-18; Exhibit 11, Crowder Decl. ¶¶10, 12, 18; Exhibit 13, Hodanbosi Decl. ¶¶8, 10, 11, 15-18.

*Second*, States will suffer injuries to their sovereign interests.  Allowing EPA to seize control of the Section 111(d) process creates an "irreparable injury" by "inver[ting] the federalism principles enshrined" in the CAA, *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016), and threatening the State's

"sovereign interests" in regulating in-state emissions and crafting "public polic[y]," *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) (saying that "invasions of state sovereignty" are "intangible harm[s]" that cannot be redressed). Indeed, a State's inability to enforce its own laws is a well-established irreparable injury. *Abbott v. Perez*, 138 S.Ct. 2305, 2324 n.17 (2018).

*Third*, the Rule will injure the States' quasi-sovereign interests. States have an interest in "challeng[ing] actions whose clear and direct effects would be the substantial disruption of the state's internal economy and impairment of the well-being of the citizenry." *Com. of Pa., by Shapp v. Kleppe*, 533 F.2d 668, 674 (D.C. Cir. 1976); *see also, e.g.*, *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150 (D.D.C. 2002). And here, oil and gas are a foundation for the States' economies. The Rule rocks that foundation. Because of costs and closures, thousands of jobs could be lost. *See, e.g.*, Exhibit 20, Patrick Springer, *North Dakota regulators worry new federal methane rule could cost jobs, thousands of barrels of oil*, INFORUM (Dec. 12, 2023), https://bit.ly/4cOBprC; Exhibit 21, Tsvetana Paraskova, *New Methane Rule Could Kill Small U.S. Oil and Gas Producers*, OILPRICE.COM (Dec. 14, 2023), https://bit.ly/3U7UVIi. Tax revenues (such as resource-specific revenues derived from severance and property taxes) will decline. *See, e.g.*, Exhibit 22, JASON BRAINERD, NAT'L CONF. STATE LEG., STATE SEVERANCE TAX OVERVIEW 11 (Oct. 19, 2022), https://bit.ly/4avLc4a (describing the billions of

dollars of oil-and-gas severance taxes collected).  Economic development and growth will be stymied.  And none of that can be unwound after the fact.  All this comes at a time when many of these same States are reeling from other EPA rules that likewise threaten hundreds of thousands of jobs.  *See generally* Exhibit 23, OXFORD ECONOMICS, U.S. AIR QUALITY STANDARDS AND THE MANUFACTURING SECTOR (Apr. 2023), https://bit.ly/3TLwVJA (describing economic impact of EPA's recent $PM_{2.5}$ rule).  Even the Small Business Administration's Office of Advocacy sharply questioned the Rule for related reasons.  *See* Exhibit 25, SBA Comment Letter (Feb. 13, 2023).

## III.    The other factors favor a stay.

Unlike the States' harms, EPA would face no discernible harm if the Rule were to be stayed.  If time were of the essence, then EPA would not have waited decades before acting.  EPA did not even issue proposed regulations until more than a year after the rulemaking process for the Rule had begun— a delay that suggests no imminent harm to EPA.  *See* 87 Fed. Reg. 74,702 (Dec. 6, 2022).  At the same time, States have long implemented their own laws and regulations governing methane emissions.  *See, e.g.*, Col. Rev. Stat. § 25-7-102; Va. Code § 45.2-1706.1.  Other EPA methane-related rules apply, too.  For instance, two prior rules address emissions of VOCs from storage tanks and other components.  *See* Exhibit 12, Stegmann Decl. ¶¶19, 20; Exhibit 11, Crowder Decl. ¶20.  Because methane is often emitted as a co-pollutant with VOCs, existing measures to control VOCs typically reduce methane emissions as well.  *Id.*  And indeed, evidence shows that these existing rules have already

yielded reductions of VOCs and co-pollutants, including methane. *See id.* All these protections will remain in place during any stay. And producers also have an economic incentive to capture and sell methane. Altogether, several things should ensure that any purported environmental effects from a few months of the status quo would be minimal or non-existent.

As to the final stay factor, the "public interest lies in a correct application of the law." *Biden*, 57 F.4th at 556. That includes the APA's requirements. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). And there is a particular "public interest in … the maintenance of the constitutional balance upon which the doctrine of federalism is founded." *Withrow v. Williams*, 507 U.S. 680, 687, (1993) (cleaned up).

Further, the public has a strong interest in reliable, affordable electricity. Sources "provide power to … homes, farms, businesses and industries. If [a source's] ability to do so is imperiled, so may be its ability to fulfill its mission to the public." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.*, 588 F. Supp. 2d 919, 934 (S.D. Ind. 2008). "[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical." *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999); *see Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1986). The same goes for the winter, when oil and gas can stave off frozen conditions. But the grid's reliability could be threatened if this Rule takes effect; for example, one study estimated that more than 30% of oil

and gas well could be shut by the time the Rule is fully implemented. *See* Exhibit 24, EARTH SYSTEM SCIENCES, POTENTIAL PRODUCTION IMPACTS OF PROPOSED EPA METHANE RULES (NSPS OOOOb & EG OOOOc) 4 (Mar. 2023). At the very least, the Rule will increase costs of energy, hurting consumers.

## CONCLUSION

The Court should stay the Rule until it decides the States' petition for review.

Respectfully submitted,

GENTNER DRUMMOND
  ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II
 *Solicitor General*
Jennifer L. Lewis
 *Deputy Attorney General*

Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

PATRICK MORRISEY
  ATTORNEY GENERAL

*/s/ Lindsay S. See*
Lindsay S. See
 *Solicitor General*
Michael R. Williams
 *Principal Deputy Solicitor General*

Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

21

TIM GRIFFIN
  ATTORNEY GENERAL

/s/ *Nicholas J. Bronni*

Nicholas J. Bronni
  *Solicitor General*
Dylan Jacobs
  *Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for State of Arkansas*

TREG TAYLOR
  ATTORNEY GENERAL

/s/ *Garrison Todd*

Garrison Todd
  *Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
garrison.todd@alaska.gov

*Counsel for State of Alaska*

CHRISTOPHER M. CARR

STEVE MARSHALL
ATTORNEY GENERAL

/s/ *Edmund G. LaCour Jr.*

Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General of
Alabama
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

ASHLEY MOODY
 ATTORNEY GENERAL

/s/ *Ashley Moody*

Henry C. Whitaker
  *Solicitor General*
James H. Percival
  *Chief of Staff*
Office of the Attorney General of
Florida
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

RAÚL R. LABRADOR

22

ATTORNEY GENERAL

/s/ *Stephen J. Petrany*
Stephen J. Petrany
  *Solicitor General*
Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

ATTORNEY GENERAL

/s/ *Joshua N. Turner*
Joshua N. Turner
  *Chief of Constitutional Litigation
  and Policy*
Alan M. Hurst
  *Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
  ATTORNEY GENERAL

/s/ *James A. Barta*
James A. Barta
  *Solicitor General*
Office of the Attorney General of
Indiana
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
  ATTORNEY GENERAL

/s/ *Eric H. Wessan*
Eric H. Wessan
  *Solicitor General*
Office of the Attorney General of
Iowa
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS KOBACH
  ATTORNEY GENERAL

/s/ *Anthony J. Powell*
Anthony J. Powell

RUSSELL COLEMAN
  ATTORNEY GENERAL

/s/ *Matthew F. Kuhn*
Matthew F. Kuhn

23

*Solicitor General*
Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8539
anthony.powell@ag.ks.gov

*Counsel for State of Kansas*


LIZ MURRILL
  ATTORNEY GENERAL

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*


ANDREW BAILEY
  ATTORNEY GENERAL

/s/ *Joshua M. Divine*
Joshua M. Divine
  *Solicitor General*
Samuel C. Freedlund
  *Deputy Solicitor General*
Missouri Attorney General's Office
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Solicitor General*
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*


LYNN FITCH
  ATTORNEY GENERAL

/s/ *Justin L. Matheny*
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


AUSTIN KNUDSEN
  ATTORNEY GENERAL

/s/ *Christian B. Corrigan*
Christian B. Corrigan
  *Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*

MICHAEL T.HILGERS
  ATTORNEY GENERAL

/s/*Grant D. Strobl*
Grant D. Strobl
  *Assistant Solicitor General*
Office of the Attorney General of
Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov

*Counsel for State of Nebraska*

DAVE YOST
  ATTORNEY GENERAL

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser*
  *Solicitor General*
  *Counsel of record*
Mathura J. Sridharan
  *Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 466-8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for State of Ohio*

*Counsel for State of Montana*

DREW H.WRIGLEY
  ATTORNEY GENERAL

/s/ *Philip Axt*
Philip Axt
  *Solicitor General*
Office of Attorney General of
North Dakota
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

ALAN WILSON
  ATTORNEY GENERAL

Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*

/s/ *Joseph D. Spate*
Joseph D. Spate
  *Assistant Deputy Solicitor General*
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for State of South Carolina*

JONATHAN SKRMETTI
    ATTORNEY GENERAL AND
    REPORTER

/s/ *Steven J. Griffin*

Steven J. Griffin
    *Senior Counsel for Strategic*
    *Litigation and Assistant*
    *Solicitor General*
Tennessee Attorney General's
Office
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
Steven.Griffin@ag.tn.gov

*Counsel for State of Tennessee*

SEAN D. REYES
    ATTORNEY GENERAL

/s/ *Christopher A. Bates*

Christopher A. Bates
    *Deputy Solicitor General*
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
chrisbates@agutah.gov

*Counsel for State of Utah*

JASON S. MIYARES
    ATTORNEY GENERAL

/s/ *Kevin M. Gallagher*

Kevin M. Gallagher
    *Principal Deputy Solicitor*
*General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of*
*Virginia*

BRIDGET HILL
    ATTORNEY GENERAL

/s/ *D. David DeWald*

D. David DeWald
    *Deputy Attorney General*
Office of the Attorney General of
Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*

26

ARIZONA LEGISLATURE

WARREN PETERSEN
PRESIDENT OF THE ARIZONA
STATE SENATE

BEN TOMA
SPEAKER OF THE ARIZONA
HOUSE OF REPRESENTATIVES

By counsel:

By counsel:

*/s/ Brunn (Beau) W. Roysden III*
Brunn (Beau) W. Roysden III
(DC Cir. Bar No. 64493)
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545

*/s/ Brunn (Beau) W. Roysden III*
Brunn (Beau) W. Roysden III
(DC Cir. Bar No. 64493)
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545

*Counsel for President of the
Arizona State Senate Warren
Petersen*

*Counsel for Speaker of the Arizona
House of Representatives Ben Toma*

Dated: April 12, 2024

27

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,200 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II

28