ORAL ARGUMENT NOT YET SCHEDULED

Case No. 24-1054
(and consolidated cases)

_____

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

STATE OF TEXAS, ET AL.,
Petitioners,
v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
Respondents.

_____

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

_____

# RESPONDENTS' REPLY ADDRESSING
# CONTINENTAL'S RESPONSE IN SUPPORT OF
# MOTION TO STAY FINAL RULE

_____

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

Of counsel:

STEPHANIE L. HOGAN
DEREK MILLS
LAURA L. COTTINGHAM
AMY BRANNING
ASHLEY MAIOLATESI
Office of General Counsel
U.S. Environmental
  Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

CHLOE H. KOLMAN
BRIAN H. LYNK
ANDREW S. COGHLAN
TSUKI HOSHIJIMA
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277 (Kolman)
chloe.kolman@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ..............................................................................................1

BACKGROUND .................................................................................................1

ARGUMENT .......................................................................................................1

    I.    The Court should not consider Continental's new arguments. .............1

    II.    Continental's merits arguments are unlikely to succeed anyway. ........3

        A.    Continental has no legitimate reliance interests in regulatory ossification. ................................................................3

        B.    The New Source Standards for associated gas are reasonable. ....................................................................................3

        C.    The Rule's control-device monitoring requirements provide compliance flexibility. ............................8

        D.    The Super-Emitter Program is within EPA's authority. ..................................................................................10

    III.    Continental demonstrates no irreparable harm. ..................................12

CONCLUSION ..................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019).................................................................2

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*,
  476 F.3d 946 (D.C. Cir. 2007).................................................................6

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................1

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981).................................................................3

*Trudeau v. FTC*,
  384 F. Supp. 2d 281 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006) .........12

*West Virginia v. EPA*,
  597 U.S. 697 (2022)................................................................................5

## Statutes

42 U.S.C. § 7411(d) ................................................................................12

42 U.S.C. § 7414(a)(1).............................................................................10

42 U.S.C. § 7604 .....................................................................................11

42 U.S.C. § 7607(d)(7)(A).........................................................................7

42 U.S.C. § 7607(d)(7)(B).........................................................................5

42 U.S.C. § 7607(d)(9)(A).........................................................................7

## Code of Federal Regulations

40 C.F.R. § 60.5375(a)(1)(ii)......................................................................5

40 C.F.R. § 60.5375(a)(2)...........................................................................5

40 C.F.R. § 60.5380(a)(2)................................................................5

40 C.F.R. § 60.5385(a)(3)................................................................5

40 C.F.R. § 60.5395(e)(1)................................................................5

40 C.F.R. § 60.5417b......................................................................9

40 C.F.R. § 60.5417b(d)(8)..............................................................9

40 C.F.R. § 60.5417b(d)(8)(iii).........................................................9

**Federal Register**

86 Fed. Reg. 63110 (Nov. 15, 2021).................................................4

87 Fed. Reg. 74702 (Dec. 6, 2022)................................................11

89 Fed. Reg. 16820 (Mar. 8, 2024)................................. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**Other Authorities**

Webster's New Collegiate Dictionary (7th ed. 1970) .............................5

**INTRODUCTION**

As a non-movant and intervenor, Continental Resources, Inc., may not challenge different parts of EPA's Rule, and claim different harms, than Movant-Petitioners do in their stay motion. The Court should disregard the arguments in Continental's "response in support" of the stay motion that exceed the scope of the motion. Continental's merits arguments are unlikely to succeed anyway, and Continental fails to demonstrate irreparable harm.

**BACKGROUND**

Continental did not petition for review of the Rule. Instead, well before the deadline to petition, Continental moved to intervene in support of petitioners. ECF#2048635.

Movant-Petitioners sought to stay the Rule pending judicial review. ECF#2049412. EPA responded in opposition. ECF#2053091. Later that day, Continental filed a "response in support" with a fourteen-page declaration. ECF#2053097. This reply addresses only the new arguments by Continental.

**ARGUMENT**

**I.      The Court should not consider Continental's new arguments.**

The "most critical" factors for whether to stay the Rule are "whether the *stay applicant* has made a strong showing" of likely success on the merits and "whether the *applicant* will be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S.

418, 434 (2009) (emphases added).  The stay motion focused only on the Existing Source Guidelines and not on other, severable parts of the Rule, Mot. 6-15; *see* EPA Resp. 23-24, and it alleged irreparable harm only as to Movant-Petitioners, Mot. 15-19.

Continental raises new merits arguments about the New Source Standards' approach to associated gas and control-device monitoring provisions related to net heating value.  Continental Resp. 7-17.  And Continental raises new arguments about the Super-Emitter Program, *id.* at 17-22, which the motion mentioned only in passing.  Continental also alleges harms to itself that purportedly flow from these new arguments and that are different in kind from harms alleged by Movant-Petitioners.

Continental's presentation of new material is improper—not only because it is a non-movant, but also because of its intervenor status.  Continental chose to intervene, rather than to petition, and thus bound itself to "only argue issues that have been raised by the principal parties."  *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 590 (D.C. Cir. 2019).  There is no "extraordinary" reason for the Court to consider Continental's new arguments.  *Id.*

## II. Continental's merits arguments are unlikely to succeed anyway.

As to Continental's cooperative-federalism arguments, Continental Resp. 2-5, EPA incorporates its prior responses, EPA Resp. 8-12. Continental's other arguments, which are new, lack merit.

### A. Continental has no legitimate reliance interests in regulatory ossification.

EPA's presumptive standards for existing sources do not "adversely affect [Continental's] material reliance interests." Continental Resp. 5-7. EPA has long issued model rules in emission guidelines that reflect EPA's role under Section 7411(d). EPA Resp. 9. EPA did not change its longstanding position on the proper federal-state balance of responsibilities under Section 7411(d). In any event, Continental cannot have legitimately relied on the indefinite application of preexisting State standards. Section 7411(d) required EPA to issue the Existing Source Guidelines, and EPA did so with years of notice. Further, final compliance for existing sources is years away. Finally, Section 7411 itself puts existing sources on notice that they may need to adjust, since the best system of emission reduction may reflect technological changes over time. *See Sierra Club v. Costle*, 657 F.2d 298, 364 & n.276 (D.C. Cir. 1981).

### B. The New Source Standards for associated gas are reasonable.

Venting and flaring of natural gas associated with oil wells ("associated gas") cause significant methane and VOC emissions. 89 Fed. Reg. 16820, 16941

(Mar. 8, 2024); 86 Fed. Reg. 63110, 63236 (Nov. 15, 2021). EPA determined that the best system for reducing associated-gas emissions is to avoid them entirely by capturing and routing the gas to a sales line—already "standard business operations for thousands of wells … throughout the country." 89 Fed. Reg. at 16942. Operators of new oil wells can comply with the Rule through sales-line routing. *Id.* Or they can comply through one or more of three other practices that "achieve[] the same level of emissions reduction": (1) using associated gas as an onsite fuel source; (2) putting the gas to another useful purpose "that a purchased fuel or raw material would serve"; or (3) injecting the gas into a well. *Id.* Operators of wells that commence construction, modification, or reconstruction between December 6, 2022, and May 7, 2026, can also comply (at least temporarily) by using a flare or other control device to reduce associated-gas emissions by at least 95% if they can demonstrate that the Rule's other compliance options are technically infeasible. *Id.* at 16945.[1]

Continental's five associated-gas arguments lack merit. First, Continental contends that routing associated gas to a sales line is not a "system of emission reduction" under Section 7411 because it does not "involve actual emissions

---

[1] Continental incorrectly claims that the Rule "prohibits" flaring of associated gas. Continental Resp. 7-9. The Rule allows routine flaring for certain new sources, 89 Fed. Reg. at 16886, and allows all sources to flare (or vent) when it is infeasible or unsafe to capture associated gas, *id*. at 16887, 16948-50.

control." Continental Resp. 7-9. But capturing and routing associated gas controls VOC and methane emissions by completely preventing their release. A system that lowers emissions to zero is a system of "emission reduction" in any ordinary sense of that term. *Reduce*, Webster's New Collegiate Dictionary (7th ed. 1970) ("to diminish in size, amount, extent, or number"). Similar requirements to capture and route emissions are common in the oil-and-gas sector. *See, e.g.*, 40 C.F.R. §§ 60.5375(a)(1)(ii), (2), 60.5380(a)(2), 60.5385(a)(3), 60.5395(e)(1). Because such standards require "the regulated source to operate more cleanly," *West Virginia v. EPA*, 597 U.S. 697, 725 (2022), they fall within the heartland of EPA's Section 7411 authority.

Second, Continental argues that EPA should have considered costs of "enclosed combustion devices, thermal oxidizers, catalytic incinerators, and deep well injection" before selecting sales-line routing as the best system of emission reduction. Continental Resp. 10. Like flares, which EPA analyzed extensively, the first three of those technologies are combustion-based control devices. *See* 89 Fed. Reg. at 16940 (summarizing cost assessment of flares). Nothing required EPA to parse the individual costs of those three technologies. Moreover, no commenter asked EPA to do so, which forecloses Continental's argument. *See* 42 U.S.C. § 7607(d)(7)(B). As for well injection, EPA reviewed available cost data but found those data insufficiently detailed to use as the basis for its assessment. 89

Fed. Reg. at 16941. Continental does not dispute that conclusion. Regardless, EPA allowed well injection as a compliance option despite uncertainties about its cost. *Id.* at 16942.

Third, Continental claims that EPA overstated the emission-reduction benefits of sales-line routing by relying on a dataset that, according to Continental, "exclud[ed] small sources of gas emissions." Continental Resp. 11. For the analysis in question, EPA estimated baseline emissions from a representative oil well that routinely vents associated gas. 89 Fed. Reg. at 16941; Technical Support Document, EPA-HQ-OAR-2021-0317-3988 at 4-3. To do so, EPA drew on a nationwide dataset from facilities with annual methane emissions between 0.015 and 2,400 tons per year. 89 Fed. Reg. at 16941. EPA reasonably surmised that at least some of the lower-emitting facilities in its dataset were wells that vented only sporadically and that otherwise routed associated gas to a sales line. *Id.* While EPA recognized that those lower-emitting facilities might artificially depress its baseline estimate, *id.*, EPA did not "exclude" them, as Continental claims. Rather, EPA used a weighted average estimate intended to better "represent[] the routine venting of associated gas." *Id.* That approach, on which EPA took comment, reflects EPA's reasonable "judgments about sampling methodology and data analysis." *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*,

476 F.3d 946, 956 (D.C. Cir. 2007); *see also* 42 U.S.C. § 7607(d)(9)(A) (arbitrary-and-capricious standard).[2]

Fourth, Continental complains that EPA should have allowed routine flaring of associated gas if an operator could show that application of the Rule's default requirements to a given well would be economically, rather than just technically, infeasible. Continental Resp. 9-10. But this kind of cost-based feasibility assessment "would necessarily take into account many aspects of plant operation that are not related to the cost of" controlling emissions from associated gas. 89 Fed. Reg. at 16951. EPA determined that the costs of sales-line routing are generally reasonable and often minimal. *Id.* at 16941-42. And if operators could avoid those costs for site-specific economic reasons, then "wells that are operating close to the margin due to inefficiencies and poor operation [could] obtain an allowance to routinely flare while more efficiently operated wells [could] not." *Id.* at 16951. EPA reasonably opted to foreclose that outcome.

---

[2] Relying on conclusory statements in its extra-record declaration, Continental suggests that the higher-emitting facilities in EPA's dataset already route associated gas to a sales line, and that those facilities' emissions were "likely" from permissible "temporary flaring" during "periods of gathering interruption." Continental Resp. 12. No record evidence supports this conjecture, and the Court cannot consider Continental's declaration when reviewing EPA's Rule, *see* 42 U.S.C. § 7607(d)(7)(A). In any case, Continental's apparent argument—that EPA overestimated emissions from a representative well that routinely vents associated gas—is belied by the fact that EPA's 344 tons-per-year estimate is less than the 450 tons per year of associated gas that an average well produces, according to the Department of Energy. 89 Fed. Reg. at 16941.

Fifth, Continental speculates that it will not be able to make the technical-infeasibility showing necessary to flare associated gas because EPA did not restrict the universe of "useful purposes" that operators must rule out. Continental Resp. 12-13. But the technical-feasibility inquiry is not unbounded, as Continental suggests. A "technically viable 'other useful purpose' is likely to require the routing of the associated gas to on-site or nearby equipment that compresses, liquifies, or transforms the gas into a physical state that can be transported by pipeline or other transportation mode to an eventual user." 89 Fed. Reg. at 16887. Thus, if an operator can show why "physical or technical constraints" prevent it from "install[ing] equipment" at a site "to convert associated gas to compressed natural gas," or show that compressed natural gas "transport in the region is not available," then it can establish the technical infeasibility of other "useful purposes." *Id.* at 16888. Continental fails to acknowledge that guidance from the preamble and fails to explain why it will be unable to demonstrate technical infeasibility.

## C.    The Rule's control-device monitoring requirements provide compliance flexibility.

Operators that use combustion-based control devices to reduce emissions from sources covered by the Rule must show that those devices perform to certain standards. 89 Fed. Reg. at 16894. How to make that showing varies by control device. *Id.*; *see also* 40 C.F.R. § 60.5417b. For certain enclosed combustion

devices and flares, the default requirement is to continuously monitor the "net heating value" of the gas entering the control device. 40 C.F.R. § 60.5417b(d)(8)(ii). But operators may instead measure net heating value through an initial performance demonstration. *See id.* § 60.5417b(d)(8)(iii). Or they can use control devices that have requirements unrelated to net heating value. *See id.* § 60.5417b(d)(8) (explaining that requirements for continuous monitoring of net heating value do not apply to devices "listed in paragraphs (d)(1) through (3) and (7)").

Continental claims that it cannot continuously monitor the net heating value of gas streams that flow only intermittently. Continental Resp. 15-17. But Continental does not explain why the other available emissions-control and monitoring options are infeasible. Indeed, Continental states that it likely *can* comply with the Rule's net heating value-related monitoring requirements for control devices, but needs at least 79 days to do so. *Id.* at 16. Continental has that time and then some. EPA recently clarified that sources that commenced construction, modification, or reconstruction between December 6, 2022, and May 7, 2024, have *180 days* from the Rule's effective date to meet applicable control-device monitoring requirements. Letter from Tomás E. Carbonell, EPA Deputy Assistant Administrator for Stationary Sources, May 6, 2024 (https://www.epa.gov

/system/files/documents/2024-05/letter-to-api-and-apx.-5.6.24-signed_1.pdf).

Continental's suggestion of impossibility is therefore unfounded.

### D. The Super-Emitter Program is within EPA's authority.

A few high-emission events cause a large proportion of emissions from the oil-and-gas industry. 89 Fed. Reg. at 16843. EPA thus finalized the Super-Emitter Program, under which EPA will notify sources of super-emitter events detected by certified third parties and require investigation. *Id.* at 16877. Contrary to Continental's claims, Continental Resp. 17-22, the Super-Emitter Program is a lawful exercise of EPA's authority under 42 U.S.C. § 7414(a)(1) to require any owner or operator of an emission source to provide information. 89 Fed. Reg. at 16877.

The Super-Emitter Program does not delegate regulatory authority to third parties. After receiving notification of potential super-emitter events from certified third parties, EPA independently reviews them for completeness and accuracy; then, and only then, EPA notifies sources. *Id.* "EPA plays a central role at every step," and no third party can independently require a source to respond. *Id.* at 16916–17. This framework is like other longstanding programs in which EPA receives citizen reports of potential violations. *Id.* at 16917. This framework does

not rely on, and does not conflict with, the Act's citizen-suit provision. Continental Resp. 18 (citing 42 U.S.C. § 7604).

The Program adequately safeguards against error. Third parties who wish to notify EPA of suspected super-emitter events must be EPA-certified and use EPA-approved remote sensing technologies. 89 Fed. Reg. at 16879. EPA will review third-party notifications "for completeness and accuracy to a reasonable degree of certainty" before deciding whether to notify an owner/operator. *Id.* at 16880, 16920. EPA reasonably concluded that the possibility of decertification will sufficiently guard against abuse by third parties. *Id.* at 16919.

Continental is mistaken about potential reputational harm from errant third-party reporting. Following EPA's independent review of notifications, EPA will initially post them online without owner/operator attribution, to allow "an opportunity to respond before the super-emitter event is publicly attributed to a particular owner/operator." *Id.* at 16880. If anything, the Program may benefit Continental because halting super-emitter events helps sources avoid noncompliance and allows recovery of gas for sale that would otherwise be lost. 87 Fed. Reg. 74702, 74755 (Dec. 6, 2022). Devoting five hours to investigate a potential super-emitter event, Continental Resp. Att. ¶48, is a minimal burden relative to the public-health impacts of super-emitter events, 89 Fed. Reg. at 16877.

## III. Continental demonstrates no irreparable harm.

Continental fails to show irreparable harm from any aspect of the Rule. The Existing Source Guidelines do not require Continental to "immediately" change any operations. Continental Resp. 6. The Guidelines do not regulate existing sources directly but instead guide States in developing plans that establish existing-source standards. 42 U.S.C. § 7411(d). States have 24 months to submit plans, and the compliance deadline for sources is 36 months after state-plan submission. 89 Fed. Reg. at 17011; EPA Resp. 15-17. The Guidelines thus have no immediate impact on Continental.

As to the New Source Standards for associated gas and control-device monitoring provisions related to net heating value, Continental incorrectly describes those requirements and thus misconstrues their effect on new sources. *Supra* Section II. Continental's discussion of reputational injury from the Super-Emitter Program is speculative, and Continental fails to substantiate that any administrative burden on sources, or any delay in notification, will cause irreparable harm. Continental Resp. 19-22; *see supra* Section II.D; *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) ("[Like] all other forms of [asserted]

irreparable harm, . . . reputational harm must be concrete and corroborated, not merely speculative."), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006).

## CONCLUSION

The Court should disregard or reject Continental's arguments and deny the motion.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Tsuki Hoshijima*
CHLOE H. KOLMAN
BRIAN H. LYNK
ANDREW S. COGHLAN
TSUKI HOSHIJIMA
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277 (Kolman)
(202) 514-6187 (Lynk)
(202) 532-3252 (Coghlan)
(202) 532-3285 (Hoshijima)
chloe.kolman@usdoj.gov
brian.lynk@usdoj.gov
andrew.coghlan@usdoj.gov
tsuki.hoshijima@usdoj.gov

*Counsel for Respondents*

Of Counsel:

STEPHANIE L. HOGAN
DEREK MILLS

LAURA L. COTTINGHAM
AMY BRANNING
ASHLEY MAIOLATESI
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the parts of the document exempted by Rule 32(f), it contains 2,600 words. This document complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman fourteen-point font.

*/s/ Tsuki Hoshijima*

## CERTIFICATE OF SERVICE

On May 17, 2024, I filed the foregoing using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

*/s/ Tsuki Hoshijima*