ORAL ARGUMENT NOT YET SCHEDULED

Case No. 24-1054
(and consolidated cases)

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

STATE OF TEXAS, ET AL.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents.*

_____

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

_____

**RESPONDENTS' OPPOSITION TO MOTION TO STAY FINAL RULE**

_____

|  |  |
|---|---|
|  | TODD KIM |
|  | Assistant Attorney General |
|  | Environment & Natural Resources Division |
|  |  |
|  | CHLOE H. KOLMAN |
| Of Counsel: | BRIAN H. LYNK |
|  | ANDREW S. COGHLAN |
| STEPHANIE L. HOGAN | TSUKI HOSHIJIMA |
| DEREK MILLS | United States Department of Justice |
| LAURA L. COTTINGHAM | Environmental Defense Section |
| AMY BRANNING | P.O. Box 7611 |
| ASHLEY MAIOLATESI | Washington, D.C. 20044 |
| Office of General Counsel | (202) 514-9277 (Kolman) |
| U.S. Environmental | chloe.kolman@usdoj.gov |
| Protection Agency |  |
| 1200 Pennsylvania Ave., N.W. |  |
| Washington, D.C. 20460 | June 11, 2024 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

GLOSSARY ........................................................................................v

INTRODUCTION ................................................................................1

BACKGROUND .................................................................................2

STANDARD OF REVIEW ...................................................................6

ARGUMENT .....................................................................................6

I.    Movants are unlikely to succeed on the merits. ................................6

    A.   EPA reasonably evaluated the Rule's advantages and disadvantages, including its costs and benefits, and was not required to use a monetized cost-benefit analysis. .............................................7

    B.   The Rule reasonably regulates fugitive emissions, including from marginal wells. ........................................................................15

    C.   The Rule's requirements for associated gas are reasonable. ..................20

II.   Movants have not demonstrated irreparable harm. ......................................21

III.  The balance of equities and public interest disfavor a stay. ..........................22

IV.   Any stay should be narrowly tailored. ...........................................................23

CONCLUSION ....................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Al-Tamini v. Adelson*,
    916 F.3d 1 (D.C. Cir. 2019)..................................................................23

*Beame v. Friends of the Earth*,
    434 U.S. 1310 (1977)........................................................................22

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) ...........................................................6

*Essex Chem. Corp. v. Ruckelshaus*,
    486 F.2d 427 (D.C. Cir. 1973) ....................................................10, 14

*Gill v. Whitford*,
    585 U.S. 48 (2018)..............................................................................23

*Lignite Energy Council v. EPA*,
    198 F.3d 930 (D.C. Cir. 1999) ...........................................................7

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) .........................................................22

*Michigan v. EPA*,
    576 U.S. 743 (2015)................................................................7, 13, 14

*New York v. Reilly*,
    969 F.2d 1147 (D.C. Cir. 1992)..............................................7, 12, 13

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................6, 21

*Novak v. Cap. Mgmt. & Dev. Corp.*,
    570 F.3d 305 (D.C. Cir. 2009) .........................................................20

*Portland Cement Ass'n v. Train*,
    513 F.2d 506 (D.C. Cir. 1975) .........................................................10

*Portland Cement Ass'n v. Ruckelshaus*,
    486 F.2d 375 (D.C. Cir. 1973) ...............................................................10, 14

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...............................................................21

*Zero Zone, Inc. v. Dep't of Energy*,
    832 F.3d 654 (7th Cir. 2016) ...............................................................15

**STATUTES**

42 U.S.C. § 7411(a)(1) ...............................................................7

42 U.S.C. § 7411(b)(1)(A) ...............................................................2

42 U.S.C. § 7411(b)(1)(B) ...............................................................2

42 U.S.C. § 7411(d) ...............................................................2, 3, 21

42 U.S.C. § 7411(d)(1) ...............................................................21

42 U.S.C. § 7412(n)(1)(A) ...............................................................14

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. part 60, subpart OOOOb ...............................................................2

40 C.F.R. part 60, subpart OOOOc ...............................................................2

40 C.F.R. § 60.5397a (2016) ...............................................................4

**FEDERAL REGISTER**

86 Fed. Reg. 63110 (Nov. 15, 2021) ...............................................................4, 9, 10, 16

87 Fed. Reg. 74702 (Dec. 6, 2022) ...............................................................4, 5, 15, 16, 17, 18

89 Fed. Reg. 16820 (Mar. 8, 2024) ...............................2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 15, 20

**CIRCUIT RULES**

D.C. Cir. R. 18(a)(1) ................................................................................23

**EXECUTIVE ORDER**

Executive Order 12866 ...........................................................................13

**OFFICE OF MANAGEMENT AND BUDGET**

OMB Circular A-4 ...................................................................................13

## GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| Existing Source Guidelines | 40 C.F.R. part 60, subpart OOOOc |
| New Source Standards | 40 C.F.R. part 60, subpart OOOOb |
| Rule | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16820 (Mar. 8, 2024) |
| Section 7411 (aka Section 111) | 42 U.S.C. § 7411 |
| VOCs | Volatile organic compounds |

# INTRODUCTION

The Clean Air Act directs EPA to reduce pollution that endangers public health and welfare.  The challenged Rule fulfills that mandate.  It substantially cuts the oil-and-gas industry's emissions of volatile organic compounds (VOCs) and methane, a potent greenhouse gas.  And it does so by requiring proven, cost-effective measures—like regular leak inspections—that are already required in some states and deployed by leading companies.  After waiting 70 days following the Rule's publication (and over four months after release of its text), Michigan Oil and Gas Association and Miller Energy Company II sought a stay from this Court.

Movants are unlikely to succeed on the merits.  They principally argue that EPA improperly disclaimed a duty to consider the Rule's costs and benefits.  But EPA did weigh the advantages and disadvantages of regulation at length, including costs and benefits, by several different methods.  Each of EPA's detailed analyses confirmed that the Rule's costs were reasonable (indeed, in most instances, quite low), both in absolute terms and relative to massive projected emission reductions.

Movants' other challenges are likewise unpersuasive.  They contend that EPA should have relaxed leak-inspection requirements for so-called "marginal wells," which individually produce no more than 15 barrels of oil equivalent per day but collectively account for roughly half of oil-and-gas sector methane emissions.  But EPA carefully considered available information on marginal wells,

1

and explained why there was no basis to give those wells the special treatment that Movants demand.  Movants' passing reference to the Rule's treatment of associated-gas emissions is also meritless.

Movants have not met their burden on the other stay factors, either.  Indeed, they do not even present argument about the balance of equities or public interest. This Court should deny a stay.

## BACKGROUND

The Clean Air Act directs EPA to list "categories of stationary sources" it finds "caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7411(b)(1)(A). EPA must then prescribe federal "standards of performance" for new, modified, and reconstructed sources, *id.* § 7411(b)(1)(B), and in turn address emissions from existing sources in a category, *id*. § 7411(d).  EPA issued the Rule challenged here on March 8, 2024.  89 Fed. Reg. 16820.  Among other discrete, severable actions, the Rule prescribes "New Source Standards" under Section 7411(b) (codified at 40 C.F.R. part 60, subpart OOOOb) and "Existing Source Guidelines" under Section 7411(d) (codified at 40 C.F.R. part 60, subpart OOOOc) for the oil-and-gas source category.  *See* EPA Opp'n 2-7, ECF#2053091 (further background on the Rule).

The New Source Standards—which regulate methane and VOC emissions of sources constructed, modified, or reconstructed after December 6, 2022—took

effect on May 7, 2024. 89 Fed. Reg. at 16820. The Existing Source Guidelines, which cover methane emissions, do not directly regulate existing sources. Rather, they guide States in submitting to EPA a satisfactory plan to establish, implement, and enforce standards of performance for existing sources in that State. 42 U.S.C. § 7411(d). States have until March 2026 to submit plans to EPA. 89 Fed. Reg. at 17009. The Rule gives sources another three years, until March 2029, to meet applicable requirements in State plans. *Id.* at 17011.

EPA issued New Source Standards and Emission Guidelines for dozens of subcategories of oil-and-gas sources. Movants take issue with two: requirements for "fugitive emissions" at well sites, and requirements for natural gas emissions from wells operated primarily for oil production ("associated gas").

1. Fugitive emissions from leaky well-site equipment are "one of the largest sources" of methane emissions from the oil-and-gas sector. 89 Fed. Reg. at 16871. To reduce fugitive emissions, the Rule requires operators to periodically inspect equipment and promptly repair leaks. *Id.* at 16871-72. The frequency and stringency of these inspections varies depending on the amount and type of equipment at a well site. At "single-wellhead" and "small" well sites, which have relatively few pieces of equipment, operators need only conduct quarterly audio-visual-olfactory inspections, where they listen, look, and smell for leaks. *Id.*; *see also id.* at 16905. At more complex "multi-wellhead" well sites, operators must

3

conduct semi-annual inspections using an optical-gas-imaging instrument or alternative leak-detection technology, along with quarterly audio-visual-olfactory inspections. *Id.* at 16871. And at well sites with multiple pieces of major production and processing equipment, the Rule requires quarterly inspections using an optical-gas-imaging instrument or alternative leak-detection technology, along with bimonthly audio-visual-olfactory inspections. *Id.*

Conducting these inspections will cost just a few hundred to a few thousand dollars per well site, per year. 87 Fed. Reg. 74702, 74729-30, 74733, 74734-35 (Dec. 6, 2022). And because inspections using optical-gas-imaging instruments are already required by other federal and state regulations, the technology is well-known to industry. *See, e.g.*, 40 C.F.R. § 60.5397a (2016) (federal standards requiring optical gas imaging for VOC leaks); Response to Public Comments, EPA-HQ-OAR-2021-0317-4009 at II-4-25 to 4-26 (noting inspection requirements in California, Colorado, New Mexico, and Pennsylvania).

The Existing Source Guidelines for fugitive emissions are the same as the New Source Standards because EPA "did not identify any factors specific to existing sources that would alter the analysis performed for new sources." 87 Fed. Reg. at 74737; *see also* 89 Fed. Reg. at 16872.

2. The routine venting and flaring of natural gas associated with oil wells—"associated gas"—causes significant methane and VOC emissions. 89 Fed. Reg. at

16941; 86 Fed. Reg. 63110, 63236 (Nov. 15, 2021).  Those emissions can be avoided by: (1) capturing and routing associated gas to a sales line; (2) using associated gas as an onsite fuel; (3) putting the gas to another useful purpose "that a purchased fuel or raw material would serve"; or (4) re-injecting the gas into a well.  89 Fed. Reg. at 16942.  The Rule allows operators to comply by employing one or more of those practices, which are already "standard business operations for thousands of wells … throughout the country."  *Id.*; *see also* 87 Fed. Reg. at 74779 (noting that, in some areas, roughly 90% of associated gas is already injected into wells).

　　To lessen compliance burdens, EPA phased in associated-gas requirements so that operators would have additional time to plan for, and implement, control measures.  Operators of existing wells modified or reconstructed after December 6, 2022 can use the less stringent control of flares (or other control devices), if those operators determine and certify annually that the Rule's other compliance options are technically infeasible.  89 Fed. Reg. at 16886.  The same flare-based compliance path is available for operators of new wells that commence construction between December 6, 2022, and May 7, 2024.  *Id.* at 16945.  Even for wells that commence construction after the Rule takes effect, operators may (until May 7, 2026) use a flare or other control device upon an annual showing that other compliance paths are technically infeasible.  *Id.*

5

The Existing Source Guidelines for associated gas are similar to the New Source Standards, except that existing wells generating up to 40 tons of methane per year can routinely flare associated gas without the technical-infeasibility determination that the New Source Standards require. 89 Fed. Reg. at 16889. EPA made this output-based distinction after receiving comments suggesting that operators of older wells might be unable to cost-effectively route associated gas to a sales line because of insufficient gas volumes. *Id.*; *see also id.* at 16947.

## STANDARD OF REVIEW

Movants have the burden to justify the "extraordinary remedy" of a stay. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). They must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) that the balance of equities favors a stay; and (4) that a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The third and fourth criteria merge here. *Id.* at 435.

## ARGUMENT

### I.     Movants are unlikely to succeed on the merits.

Movants argue that EPA failed to consider the Rule's costs and benefits and acted arbitrarily or capriciously in setting standards for fugitive and associated-gas emissions. None of those arguments is likely to succeed.

A.    **EPA reasonably evaluated the Rule's advantages and disadvantages, including its costs and benefits, and was not required to use a monetized cost-benefit analysis.**

To determine the "best system of emission reduction" that is "adequately demonstrated," EPA "tak[es] into account the cost of achieving such reduction," along with other factors.  42 U.S.C. § 7411(a)(1).  EPA must thus balance costs against emission-reduction benefits, and it cannot adopt a standard of performance if the cost would be unreasonable.  This Court affords EPA a "great degree of discretion" in balancing the statutory factors.  *Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999); *see, e.g.*, *New York v. Reilly*, 969 F.2d 1147, 1153 (D.C. Cir. 1992) (holding that Section 7411 allows EPA to balance air and non-air benefits and costs); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015) (holding, under a different Clean Air Act provision, that "[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost").

To ensure the Rule appropriately balanced all the statutory factors and was rational, EPA broadly evaluated its advantages and disadvantages, including its projected emission reductions balanced against compliance costs.  89 Fed. Reg. at 16866-67.  EPA did this through several different analyses, including by weighing costs against emissions reductions of each individual control selected as the "best system."  *Id.* at 16863-66.  EPA also considered the overall cost to the oil-and-gas

7

industry of the Rule's collective standards, including compliance costs relative to annual industry capital expenditures, and compliance costs relative to industry revenues. *Id.* EPA further evaluated the Rule's costs in comparison to its substantial benefits to the climate, the natural environment, and human health stemming from its significant projected reductions in methane and VOC emissions. *Id.* at 16867-68.

In considering individual emission controls, EPA weighed costs (both capital and operating costs) and benefits (emission reductions), including by calculating each control's "cost-effectiveness." *Id.* at 16863-64. EPA has applied the cost-effectiveness metric in Section 7411 rulemakings for decades to meet the statutory obligation to weigh costs. This traditional metric compares the costs of installing, operating, and maintaining each control option (i.e., the "system") against the amount of emission reduction estimated to be achieved by that control option, and expresses the comparison as a dollar amount per ton of emissions avoided. *Id.* at 16864. The cost-effectiveness metric lets EPA assess whether a control achieves emission reductions at reasonable cost by "allow[ing] comparisons of relative costs and outcomes (effects) of two or more options [and] provid[ing] a means of assessing consistency across rules regulating, and sectors regulated for, the same pollutant." *Id.*

8

Notably, EPA found that each of the controls it identified as the best system achieves methane reduction at reasonable cost-effectiveness values that range from $89 to $2,048 per ton of reductions achieved. *Id.* at 16865; *see also id.* at 16927, Table 18 (describing cost-effectiveness ranges for controller systems); *id.* at 16931, Table 20 (same for pumps).

These values were comparable to, and often much lower than, the costs per ton EPA had estimated in its 2016 methane rule for new oil-and-gas sources, where it adopted controls with cost-effectiveness values up to $2,185 per ton. 89 Fed. Reg. at 16864. Cost-effectiveness metrics lower than those for controls EPA adopted in 2016 support the reasonableness of the new Rule, as "sources have been complying with the 2016 [standards] for years without deleterious effect on the industry as a whole." *Id.* Similarly, the cost-effectiveness values that EPA found reasonable for VOC reductions from new sources (up to $5,540 per ton) are well within the range of values EPA previously has found to be reasonable in rules regulating VOC both for the oil-and-gas sector, and for other industries. *Id.* at 16864 n.167.

Next, EPA evaluated the collective costs of the Rule's suite of standards in the context of the oil-and-gas industry as a whole. *Id.* at 16863. EPA did this in two ways: (1) comparing the value of the expected capital costs of Rule compliance to the industry's overall new capital expenditures; and (2) comparing

compliance costs (including operating costs) to the industry's estimated revenues. *Id.* at 16865. For the first analysis, EPA projected that the annualized value of the industry's compliance-related capital expenditures from 2024 to 2038 would be about $2.5 billion in 2019 dollars, representing only 1.6% to 3.2% of industry's annual capital expenditures. *Id.* Notably, the percentage increase in capital costs from complying with this Rule are many times smaller than that from other Section 7411 rules that this Court has upheld as reasonable. *Id.*; *see also* 86 Fed. Reg. at 63,156-57 (citing *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 437 (D.C. Cir. 1973) (over 15% cost increase from rule compliance), and *Portland Cement Ass'n v. Train*, 513 F.2d 506, 508 (D.C. Cir. 1975) (12% increase)).

For the second industry-wide analysis, EPA estimated annual compliance costs from 2024 through 2038, as well as the offsetting value gain from natural gas "saved" (i.e., recovered, or not emitted, and therefore available to sell) from pollution controls. 89 Fed. Reg. at 16865. EPA compared that value to the latest available revenue data from the Census Bureau. *Id.* The estimated annualized compliance costs are just 0.8% of annual revenues, or 0.5% when offsetting the value of saved natural gas. In short, the industry's costs of complying with the Rule are well under one percent of what the industry makes each year. *Id.* at 16866.

10

In addition to considering the Rule's disadvantages as reflected in costs, EPA considered its advantages, namely its significant projected benefits to the climate, the environment, and human health. EPA noted that the oil-and-gas sector is the United States' largest source of industrial emissions of methane, a very potent greenhouse gas (83 times more powerful than carbon dioxide at trapping heat over a 20-year timeframe). 89 Fed. Reg. at 16867. The Rule is projected to bring significant methane reductions—in total, a 79 percent reduction from regulated sources from 2024 to 2038. *Id.* Noting that anthropogenic (i.e., human-induced) methane emissions are responsible for one-third of the climate change the planet is experiencing today and are driving near-term temperature increases, EPA concluded that the Rule's methane reductions provide one of the nation's "best opportunities to reduce near-term warming and offer[] important climate benefits." *Id.*

EPA also noted significant benefits to human health and the environment from Rule-related reductions in VOC emissions. *Id.* at 16867-68. VOCs are linked to numerous human illnesses, and are a key precursor to ground-level ozone, which can harm both human health and the environment. *Id.* at 16867. The oil-and-gas industry causes roughly one-fourth of the nation's anthropogenic VOC emissions, and the Rule is projected to reduce those by nearly half between 2024 and 2038. *Id.*

11

In summation, EPA reasoned that "while the industry will bear some costs to comply with the [Rule], each of these analyses supports the EPA's determination that the costs associated with compliance with the final standards are reasonable." *Id.* at 16867. The Rule will achieve "substantial and meaningful reduction in methane and VOC pollution" through proven, common-sense measures, and its costs are "consistent with costs of control that the source category has expended for years to comply with existing state and Federal standards, and on voluntary actions to reduce emissions," without economic disruption. *Id.* at 16867-68. EPA determined that these emission reductions "and the associated positive impacts on public health and the natural environment … outweigh [the Rule's] disadvantages, namely cost of industry compliance in the context of the industry's revenue and expenditures." *Id.* at 16868. EPA's finding on this point is well supported by the analyses described above and is not arbitrary or capricious. *See New York*, 969 F.2d at 1150.

Movants argue that EPA committed legal error by "wrongly disclaim[ing] any need for cost-benefit balancing." Mot. 11; *see id.* (arguing that "one-sided" cost-effectiveness analysis "does not count."). But EPA's extensive, multi-faceted discussion of costs and benefits, summarized above, shows why that argument is unlikely to succeed.

12

Movants also argue that Section 7411 "requires" EPA to undertake a "formal" cost-benefit analysis when determining the "best" system of emission reduction.  Mot. 8-9.  But neither Section 7411 nor the Supreme Court's decision in *Michigan v. EPA* required EPA to conduct a formal-cost benefit analysis of the Rule.  Formal cost-benefit analysis is a particular type of systematic, economic analysis conducted according to Office of Management and Budget criteria, *see* OMB Circular A-4 at 27-57, and is generally done by agencies to comply with Executive Order 12866. Formal cost-benefit analysis is distinct from cost-benefit analysis as that term is colloquially used, and is further distinct from the consideration of advantages and disadvantages of rulemaking that was the focus of *Michigan*.  *See* 576 U.S. at 759.

Section 7411 does not require formal cost-benefit analysis.  Its text does not prescribe a specific metric to use in considering costs.  Consequently, this Court gives a high degree of deference to EPA's technical judgments about how to take cost into account when setting standards of performance under Section 7411.  *See, e.g.*, *New York*, 969 F.2d at 1152.  In fifty years of administering Section 7411, EPA has never relied on formal cost-benefit analysis in promulgating new-source standards or emissions guidelines.  And this Court has squarely rejected Movants' position, holding repeatedly that EPA is *not* required by Section 7411 to use formal cost-benefit analysis, but rather may use other metrics that allow reasoned

13

consideration of costs and other relevant factors. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973); *Essex*, 486 F.2d at 437.

The methodologies EPA used in the Rule "satisfied the … directive to consider costs, both in the context of the individual [best system] analyses for individual emissions source (as directed by the language of the statute) and in the context of the rule as a whole." 89 Fed. Reg. at 16866. Most importantly, EPA's approach enabled it to broadly consider the Rule's advantages and disadvantages, including costs and benefits. *Id.* at 16866-67. EPA's approach complied with the statute.

It also complied with *Michigan*. That case addressed whether EPA could entirely ignore costs in deciding whether it was "appropriate and necessary" under a different provision of the Clean Air Act, 42 U.S.C. § 7412(n)(1)(A), to regulate hazardous air pollutants from certain power plants. The Supreme Court found that the phrase "appropriate and necessary" was "capacious" and that, "[r]ead naturally in the present context, the phrase 'appropriate and necessary' requires at least some attention to cost." 576 U.S. at 752. *Michigan* did not hold, however, that EPA was required to rely on a formal cost-benefit analysis as its method. Just the opposite: "We need not and do not hold that the law unambiguously required the Agency … to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id.* at 579. The Court stressed that

"[i]t will be up to [EPA] to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* Thus, to the extent *Michigan* has any application here, EPA's weighing of the Rule's advantages and disadvantages is consistent with the Court's holding.

Movants' remaining criticisms focus on the formal cost-benefit analysis that EPA included in its Regulatory Impact Analysis. Mot. 12-13. As Movants recognize, however, EPA prepared that analysis solely to comply with an Executive Order and did not consider it in making "best system" determinations. *Id.* at 12; *accord* 89 Fed. Reg. at 16866 n.175.[1] Because it was not the basis for the Rule, any alleged defects in that analysis cannot possibly support granting a stay.

## B.     The Rule reasonably regulates fugitive emissions, including from marginal wells.

The Rule's fugitive-emission requirements for well sites reflect a common-sense intuition: well sites with more pieces of potentially leaky equipment are, on average, more prone to leaks. Empirical analyses bear this out. 87 Fed. Reg at 74725, 74726 Table 7, 74732. As one study put it, "site equipment counts … exhibited the strongest associations with both frequency and magnitude of sitewide emissions." 89 Fed. Reg. at 16990 n.661. And EPA confirmed, through careful

---

[1] EPA disagrees with Movant-Petitioners' contentions regarding this analysis. *See, e.g.*, Response to Public Comments at A-6-13; *Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 679 (7th Cir. 2016).

study, that this was true, both at higher-producing wells and at marginal wells producing no more than 15 barrels of oil equivalent per day. *Id.* at 16905-06; 87 Fed. Reg. at 74730; Technical Support Document, EPA-HQ-OAR-2021-0317-3988, at Attachment A, 6-5 to 6-9. The Rule therefore requires less frequent inspections at well sites that have the fewest pieces of equipment (regardless of their production level), and more frequent inspections at sites with more equipment, and thus more potential leaks. 89 Fed. Reg. 16871; *see also* 87 Fed. Reg. at 74726 Table 7 (equipment counts at different well site classifications).

The stringency of those inspections varies depending on the risk of leak non-detection. 89 Fed. Reg. at 16905. That risk is lower at well sites with relatively little equipment, where the most common leak source—an open "surface casing valve"—will be readily detectable by hearing, sight, or smell. 87 Fed. Reg. at 74729, 74731. So, at those sites, the Rule requires only audio-visual-olfactory inspections. *Id.* By contrast, because sites with relatively more equipment have "additional piping," "connection points," and "valves," they also have additional "generally smaller" leaks that are harder to detect with the unaided senses. *Id.* at 74732. Thus, those sites must be inspected using a more sensitive optical-gas-imaging instrument, or another leak-detection technology. *Id.*

16

In short, EPA tailored the Rule's requirements by selecting the inspection frequencies and techniques most likely to cost-effectively detect leaks at different types of well sites. *See id.* at 74725-35. That approach was eminently reasonable.[2]

Movants contend that EPA should have based leak-inspection requirements on well-site production levels rather than well-site equipment. Mot. 14-18. But the available data demonstrate that, unlike equipment count, well production is a poor predictor of the frequency and magnitude of fugitive emissions. 87 Fed. Reg. at 74730-31. For instance, wells that produce less than two barrels of oil equivalent per day emit more fugitive emissions, on average, than wells that produce two to six barrels of oil equivalent. *Id.* at 74730. Despite low production levels, moreover, individual marginal wells can generate significant fugitive emissions. *Id.* at 74729. And though marginal wells produce only about seven percent of the nation's oil-and-gas supply (not 10 percent as Movants claim), they account for roughly half of sector-wide methane emissions. Technical Support Document at 6-1 to 6-3. Commensurate with that impact, roughly half of the Rule's emission reductions come from marginal wells. *Id.* at 6-3 to 6-4. Movants

---

[2] EPA also considered an alternative approach that would have exempted well sites from inspection requirements if a one-time audit revealed that those well sites had fugitive emissions of less than three tons per year. 86 Fed. Reg. at 63169. But industry commenters objected to the audit requirement as unwieldly. 87 Fed. Reg. at 74724-25. And other commenters noted that a one-time audit was a poor guard against future leaks, which could be substantial if key equipment malfunctioned. *Id.* EPA agreed and therefore changed course. *Id.* at 74725-27.

are thus wrong to suggest that low production equals low emissions, and that the Rule's regulation of marginal-well emissions is "disproportionate."  Mot. 1.

Movants fare no better by insisting that the Rule's fugitive-emission requirements are "cost-prohibitive" for marginal-well operators, and that EPA failed to consider those cost impacts.  Mot. 20.  In fact, EPA carefully considered marginal-well economics, devoting a chapter of its Technical Support Document to the subject.  *See* Technical Support Document at 6-1 to 6-15.  EPA estimated that average annual net profits from marginal oil and gas wells were roughly $42,033 and $5,648, respectively.  *See id.* at 6-9, Table 6-4.  Those per-*well* profit estimates exceed even the $2,651-$4,232 in annual cost per well *site* of the Rule's more stringent leak-inspection requirements.  87 Fed. Reg. at 74733 Table 12, 74734-35 Table 14.  And EPA determined that sites subject to those requirements will typically have multiple wells.  *Id.* at 74726 Table 7.  Many, if not most, well sites—50-60 percent, by EPA's reckoning—will be subject to the Rule's least stringent inspection requirements, which cost just $336-$660 annually.  Technical Support Document at 6-8.  Finally, while Movants portray marginal wells as "small," "family-run" operations, Mot. 17, the record indicates that "92% of marginal wells are owned by large companies with average [annual] revenues of over $100 million."  Response to Public Comments at II-4-43.  All this belies

18

Movants' claim that marginal-well operators generally will be unable to bear leak detection costs.

How those costs might affect business decisions of individual operators depends on a raft of variables, including the characteristics of an operator's wells (e.g., well-production levels, equipment types, and age), the operator's accounting practices and overall financial health, the tax implications of well closure for that operator, and the presence of marginal-well buyers.  Technical Support Document at 6-11 to 6-14.  Because of this "heterogeneity," and because firm-specific information is largely unavailable, EPA could not "determine the full impact of regulation on the financial status of marginal well owners" nor "predict which firms will be most adversely affected by regulatory costs."  *Id*. at 6-13 to 6-14.  But EPA's acknowledgment of a data limitation is not a "concession" that it did not consider cost impacts on marginal-well operators.  Mot. 18.  Section 7411 does not demand that EPA assess cost impacts on individual operators when setting nationwide regulations.  *See supra* Part I.A.  EPA gave due consideration to the impacts that the Rule would have on marginal-well operators and explained at length why marginal wells were not entitled to special treatment as a regulatory subcategory.  No more was required.

19

C.    **The Rule's requirements for associated gas are reasonable.**

In passing, Movants fault EPA for taking a "one-size-fits-all" approach to associated-gas emissions. Mot. 14. EPA did nothing of the sort. To the contrary, it phased in requirements for different subcategories of wells, and it provided multiple compliance pathways for all operators. *Supra* 4-5.

Movants suggest that each and every compliance path will be "excessively costly" for "most" marginal-well operators, Mot. 19, but they offer no analysis to support their assertion. Nor does their cursory string cite to 11 pages of comment letters, *id.*, specify the basis for their conclusory objection. This is deficient, and Movants cannot cure the deficiency on reply. *See Novak v. Cap. Mgmt. & Dev. Corp.*, 570 F.3d 305, 316 n.5 (D.C. Cir. 2009) (To "prevent sandbagging of appellees and respondents, the court treats an argument as waived when the petitioners were obscure on the issue in their opening brief and only warmed to the issue in their reply brief") (cleaned up).

In any case, Movants undercut their own vague claims about exorbitant costs by insisting that they are already flaring associated gas from low-production wells or are using associated gas as onsite fuel—two practices that could satisfy the Rule's requirements. 89 Fed. Reg. at 16886-89. For example, two of Movants' declarants assert that at "most" of their well sites, they use all but a "de minimis" quantity of associated gas for onsite fuel. Mot. Ex. A ¶12; Ex. B ¶7. A third states

that for "many of [its] marginal well sites, any associated gas that is not reused as fuel or for another useful purpose is economically and practically flared." Mot. Ex. L ¶7. Taken at face value, these statements bolster EPA's characterization of the Rule's standards and guidelines as reflecting "proven, cost-effective" approaches. 89 Fed. Reg. at 16823.

## II.    Movants have not demonstrated irreparable harm.

Irreparable harm must be of "such imminence that there is a clear and present need for equitable relief." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Harm must be "both certain and great." *Id.* "[S]imply showing some 'possibility of irreparable injury'" is insufficient. *Nken*, 556 U.S. at 434-35.

Movants' claimed harms are neither certain nor imminent. Many relate to alleged burdens of complying with the Existing Source Guidelines. *See* Mot. Ex. A ¶¶14, 21; Ex. B ¶¶11, 25; Ex. L ¶15. But the Guidelines do not regulate existing sources directly. 42 U.S.C. § 7411(d). Rather, States develop, implement, and enforce standards for those sources. *Id.* Because States can deviate from the Guidelines, *id.* § 7411(d)(1), Movants' estimates of existing-source compliance costs are speculative. And because the Rule gives States until 2026 to submit their plans, and gives sources regulated under those plans until 2029 to comply, it will be several years before the Rule results in *any* compliance costs at wells that were

21

not constructed, modified, or reconstructed after December 6, 2022.  *See supra* 3.
Such costs are no basis for a stay pending review.

Movants' claims of irreparable harm from the New Source Standards are
also unavailing.  While three declarants say that they have wells that are, or will
soon be, subject to those standards, none identifies any specific cost that they will
incur as a result.  Mot. Ex. A ¶24; Ex. K. ¶14; Ex. L ¶14.  These declarants also
note that certain "modifications or improvements" to "existing well sites" will
trigger "Subpart OOOOb requirements," Mot. Ex. A ¶¶26-27; Ex. K ¶¶11,13; Ex.
L ¶19, but this simply describes the Rule's operation without proof of harm.  And
while the Rule may well factor into Movants' members' business decisions, Mot.
Ex. B ¶24, Ex. K ¶14, the same could be said of any regulation.  Far more is
required to satisfy this Court's "high standard for irreparable injury" based on
"purely financial or economic" harm.  *Mexichem Specialty Resins, Inc. v. EPA*, 787
F.3d 544, 555 (D.C. Cir. 2015).

Finally, Movants' 70-day "delay in … seeking a stay vitiates" any "force of
their allegations of irreparable harm."  *Beame v. Friends of the Earth*, 434 U.S.
1310, 1313 (1977).

## III.    The balance of equities and public interest disfavor a stay.

Movants make no arguments on the other requisite stay factors and instead
rely on a previous stay motion.  Mot. 22.  This motion fails on that basis alone.

Although this Court "looks with extreme disfavor on the filing of duplicative briefs" *on the merits*, Handbook Part X.A.2, at 38, the rules require *every* stay motion to "discuss, with specificity, … the possibility of harm to other parties if relief is granted; and … the public interest," Cir. R. 18(a)(1).  Applicants for extraordinary relief cannot "incorporat[e] by reference" each other's arguments "to evade word limits."  *Al-Tamini v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).  If the Court considers the balance-of-harms and public-interest arguments made by the State Movants, it should reject those arguments for reasons stated in EPA's response to that motion.  *See* EPA Opp'n 19-23, ECF#2053091.

## IV.     Any stay should be narrowly tailored.

Movants are not entitled to a stay, but if this Court determines otherwise, interim relief must "be limited to the inadequacy that produced the[ir] injury."  *Gill v. Whitford*, 585 U.S. 48, 68 (2018).  Because Movants allege harm only from certain requirements, and then only as those requirements apply to marginal wells, there is no cause to stay other, severable aspects of the Rule.

## CONCLUSION

A stay should be denied.

DATED: June 11, 2024                     Respectfully submitted,

                                         TODD KIM
                                         Assistant Attorney General
                                         Environment & Natural Resources Division

/s/ *Andrew S. Coghlan*
CHLOE H. KOLMAN
BRIAN H. LYNK
ANDREW S. COGHLAN
TSUKI HOSHIJIMA
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277 (Kolman)
(202) 514-6187 (Lynk)
(202) 532-3252 (Coghlan)
(202) 532-3285 (Hoshijima)
chloe.kolman@usdoj.gov
brian.lynk@usdoj.gov
andrew.coghlan@usdoj.gov
tsuki.hoshijima@usdoj.gov

*Counsel for Respondents*

OF COUNSEL:

STEPHANIE L. HOGAN
DEREK MILLS
LAURA L. COTTINGHAM
AMY BRANNING
ASHLEY MAIOLATESI
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that the foregoing complies with the requirements of Fed. R. App. P. 27(d)(2)(A) because it contains 5,199 words, excluding exempted portions, according to the count of Microsoft Word.

/s/ *Andrew S. Coghlan*
ANDREW S. COGHLAN


**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing Opposition have been served through the Court's CM/ECF system on all registered counsel this 11th day of June, 2024.

/s/ *Andrew S. Coghlan*
ANDREW S. COGHLAN