ORAL ARGUMENT NOT YET SCHEDULED

Nos. 24-1101 & 24-1103 (consolidated with 24-1054)

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

MICHIGAN OIL AND GAS ASSOCIATION and
MILLER ENERGY COMPANY II, LLC*,*

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents.*

---

**INDUSTRY ASSOCIATION PETITIONERS' REPLY IN SUPPORT OF MOTION TO STAY**

---

Zachary C. Larsen
Clark Hill PLC
215 S Washington Square, Ste. 200
Lansing, MI 48933
(517) 318-3053
zlarsen@clarkhill.com

Anthony P. Campau
Clark Hill PLC
1001 Pennsylvania Ave., Ste. 1300 South
Washington, D.C. 20004
(202) 572-8664
acampau@clarkhill.com

*Counsel for Petitioners Michigan Oil and Gas Association and Miller Energy Company II, LLC ("MOGA Petitioners")*

James D. Elliott (DC Bar #46965)
Spilman Thomas & Battle, PLLC
1100 Bent Creek Boulevard, Suite 101
Mechanicsburg, PA 17050
(717) 791-2012
jelliott@spilmanlaw.com

*Counsel For The Independent Petroleum Association Of America, Arkansas Independent Producers And Royalty Owners, Domestic Energy Producers Alliance, Eastern Kansas Oil & Gas Association, Gas And Oil Association Of West Virginia, Illinois Oil & Gas Association, Independent Petroleum Association Of New Mexico, Indiana Oil And Gas*

*Association, International Association Of Drilling Contractors, Kansas Independent Oil & Gas Association, Kentucky Oil & Gas Association, National Stripper Well Association, North Dakota Petroleum Council, Ohio Oil And Gas Association, Petroleum Alliance of Oklahoma, Panhandle Producers & Royalty Owners Association, Pennsylvania Independent Oil & Gas Association, Permian Basin Petroleum Association, Petroleum Association of Wyoming, Texas Alliance Of Energy Producers, Texas Independent Producers & Royalty Owners Association, and Western Energy Alliance ("Producer Association Petitioners")*

# TABLE OF CONTENTS

Page

Index of Authorities ........ iv

Glossary ........ vi

Introduction ........ 1

Argument ........ 1

I. Industry Association Petitioners are likely to succeed on the merits. ........ 1

A. EPA did not adequately consider cost impacts on marginal wells and the industry in promulgating the Methane Rule. ........ 1

B. EPA arbitrarily and capriciously imposed unnecessary compliance costs on smaller, marginal wells. And it failed to adequately consider the Methane Rule's impacts on these wells. ........ 5

II. Industry Association Petitioners demonstrated irreparable harm, and the other factors favor a stay ........ 10

Conclusion ........ 11

Certificate of Compliance ........ 13

## INDEX OF AUTHORITIES

Page

**Cases**

*Al-Tamini v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019)..........11

*Essex Chem. Corp v. Ruckelshaus*,
486 F.2d 427 (D.C. Cir. 1973) .......... 2, 4, 7

*GPA Midstream Ass'n v. Dep't of Transportation*,
67 F.4th 1188 (D.C. Cir. 2023) ..........4

*Metlife, Inc. v. Fin. Stability Oversight Council*,
177 F.Supp.3d 219 (D.D.C. 2019) ..........4

*Michigan v. EPA*,
576 U.S. 743 (2015) ..........3, 4

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..........9

*Nat'l Lime Ass'n v. EPA*,
627 F.2d 416 (D.C. Cir. 1980) ..........6

*Portland Cement Ass'n v. Ruckelshaus*,
486 F.2d 375 (1973) ..........2, 3

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ..........10

*Xiaomi Corp. v. Dep't of Def.*,
2021 WL 950144 (D.D.C. March 12, 2021) ..........10

**Statutes**

42 U.S.C. § 7411(a) ..........4

42 U.S.C. § 7411(b)(1)(B) ..........4

**Other Authorities**

87 Fed. Reg. 74,702 (Dec. 6, 2022) .......................................................................9

89 Fed. Reg. 16,820 (Mar. 8, 2024) ................................................................ passim

*Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review* (Dec. 2023) ........6

## GLOSSARY

| | |
|---|---|
| CAA | Clean Air Act |
| BSER | Best System of Emission Reduction |
| EPA | Environmental Protection Agency |
| MEC | Miller Energy Company II, LLC |
| MOGA | Michigan Oil and Gas Association |
| NSPS | New Source Performance Standards |
| VOC | Volatile Organic Compound |
| Methane Rule | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) |

## INTRODUCTION

Industry Association Petitioners file this reply in support of their Motion to Stay (Doc. 205134) (the "Motion") the U.S. Environmental Protection Agency's ("EPA's") *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (Mar. 8, 2024) (the "Methane Rule"), and to address arguments raised in responses filed by EPA (Doc. 2059176), Environmental and Health Respondent-Intervenors (Doc. 2059169), and State Respondent-Intervenors (Doc. 2059180) (collectively, the "Opposing Parties").

## ARGUMENT

### I. Industry Association Petitioners are likely to succeed on the merits.

#### A. EPA did not adequately consider cost impacts on marginal wells and the industry in promulgating the Methane Rule.

EPA failed to adequately consider costs in promulgating the Methane Rule because it imposed significant costs that threaten closing the majority of marginal wells owned by small operators, *see, e.g.,* Mot. Ex. A, ¶ 29, while conceding it "*cannot estimate the impacts* of the final regulation on the owners or operators of marginal wells." TSD, 6-1. The CAA's statutory BSER and "appropriate[ness]" standards demand more.

Responding to Industry Association Petitioners' cost criticisms, Opposing Parties first suggest this Court has already rejected any claim that Section 111

requires a cost-benefit analysis. Not so. *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375 (1973), only conceded as a time-efficiency concern that EPA need not prepare its own cost-benefit analysis addressing each "pollution device"—not that BSER allows EPA to wholly ignore any cost-benefit evaluation of a Rule on an industrywide or facility basis. *Id.* at 387. And this Court has often repeated that BSER *does* require a "pro and con" balance, *id.* at 385, to ensure it can be "reasonably expected to serve the interests of pollution control *without becoming exorbitantly costly* . . . ." *Essex Chem. Corp v. Ruckelshaus*, 486 F.2d 427, 433–34 (D.C. Cir. 1973). In fact, *Portland Cement* evaluated costs on a per-facility basis. 486 F.2d at 387. Thus, cost impacts matter and must be fairly evaluated.

Moreover, in *Portland Cement*, this Court admonished EPA that cost-benefit information "should be considered by the Administrator, if adduced in the comments . . . ." 486 F.2d at 387. Yet EPA here flatly rejected any cost-benefit balancing in favor of a reductive "cost-effectiveness" calculation. 89 Fed. Reg. at 16,864 & 16,866. And it did so despite significant evidence of adverse cost impacts to marginal well owners. *See, e.g.,* 89 Fed. Reg. at 16,905 (commenting that compliance costs would be "'prohibitive for small owners and operators'" of marginal wells "and will result in the end of their operations"). EPA thus failed its statutory duties.

Opposing Parties claim *Portland Cement* allowed "far larger" impacts of up to a 12% increase in compliance costs. Doc. 2059169, p. 5. But, for the rule in *Portland Cement*, EPA balanced facility-specific percentages of compliance costs to revenue, not merely *industrywide* revenue. 486 F.2d at 387. Opposing Parties conflate the two. And, here, EPA made no facility-based cost calculations. Rather, EPA's consideration of cost impacts to marginal wells relied heavily on marginal wells held by large producers (not smaller facilities like Miller Energy). *Compare* TSD, 6-5 & 6-14 *with* Mot. Ex. A, ¶¶ 5–6, 12, & 20.

Ultimately, looking at *facility* compliance costs, EPA admits the rule demands ***over 85%*** of the average well's profits. Opposing Parties concede a relatively small margin for marginal wells (hence their name) of about $42,000 per facility. Doc. 2059169, p. 7. Yet EPA calculated annual compliance costs of $36,044 per site just for flares alone. 89 Fed. Reg. 16,940. That 85.7% cost impact cannot be justified for producers like Miller Energy who hold predominantly (or exclusively) marginal wells. Mot. Ex. A, ¶¶ 12 & 20. Nor has EPA made any attempt to justify such impact based on the contributions of individual low-producing facilities. Instead, EPA focuses solely on aggregate impacts.

Opposing Parties also each incorrectly attempt to frame Industry Association Petitioners' argument as being that *Michigan v. EPA*, 576 U.S. 743 (2015), itself demands a cost-benefit analysis, then attack that strawman with *Michigan*'s

disclaimer that the Court "*need not* and did not hold that the law unambiguously required the Agency . . . to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id.* at 759 (emphasis added). Industry Association Petitioners' argument is different: when read as a cohesive whole, Section 111—through both its BSER ("taking into account cost") mandate, 42 U.S.C. § 7411(a), and "appropriate[ness]" determination, 42 U.S.C. § 7411(b)(1)(B)—collectively require a cost-benefit analysis (not that *Michigan* itself compels that result).

*Michigan*—while not needing to dive that deep—is certainly consistent. On the statutory "appropriate[ness]" determination, the Court observed: "No regulation is 'appropriate' if it does significantly *more harm than good*." 576 U.S. at 752 (emphasis added). That implies balancing costs *and* benefits. *Id.* Courts—including this one—seem to agree. *See, e.g., GPA Midstream Ass'n v. Dep't of Transportation*, 67 F.4th 1188, 1196 (D.C. Cir. 2023) ("To be appropriate . . . the standard must be 'practicable' *and the benefits must justify the costs*.") (emphasis added); *Metlife, Inc. v. Fin. Stability Oversight Council*, 177 F.Supp.3d 219, 240 (D.D.C. 2019) ("In the end, *cost must be balanced against benefit* because '[n]o regulation is 'appropriate' if it does significantly more harm than good.'") (quoting *Michigan*, 576 U.S. at 752) (emphasis added). The BSER analysis also requires balancing both sides of the equation. *Essex*, 486 F.2d at 433–34. So, notwithstanding that *Michigan* did not

squarely address this question, Section 111(a) and (b)(1)(B)—read together—require a cost-benefit analysis.

Again, EPA disclaimed any need to balance those relevant factors here. 89 Fed. Reg. at 16,836, 16,864, & 16,866. That was error. Industry Association Petitioners are likely to succeed.

### B. EPA arbitrarily and capriciously imposed unnecessary compliance costs on smaller, marginal wells. And it failed to adequately consider the Methane Rule's impacts on these wells.

Next, Opposing Parties generally argue that EPA appropriately considered the Methane Rule's impacts on marginal wells and imposed reasonable compliance obligations on these wells. But EPA did the opposite.

First, while Opposing Parties cite EPA's *Background Technical Support Document for (TSD) for the Final New Source Performance Standards (NSPS) and Emissions Guidelines (EG)*, November 2023 ("TSD") as supporting their arguments that EPA adequately considered adverse financial impacts on marginal wells, their arguments ignore the significant deficiencies in the TSD. Most notably, EPA admits that *it did not estimate* the Methane Rule's injurious financial impacts on marginal wells. *Id.* at 6-1 ("“EPA cannot estimate the impacts of the final regulation on the owners or operators of marginal wells."). EPA echoed that concession in its Regulatory Impact Analysis. *See Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions*

*Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review* (Dec. 2023), at pp. 4–10 (acknowledging EPA "cannot estimate" impacts on marginal wells).

Moreover, where it makes *any* cost evaluation, the TSD looks the wrong direction. It relies heavily "as a point of comparison for cost information provided by commenters" on a case study of a break-even analysis based on available data related to Diversified Energy Company ("Diversified"), the "largest operator [of] oil and natural gas wells in the country" with "more than 60,000 wells across Appalachia[.]" *Id*. at 6-5 & 6-14. Relying on the largest well owner in the country (Diversified) as a model is not a representative or rational means to evaluate the marginal well industry as a whole or to identify financial break-even points for most owners or operators. *See, e.g., Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431–33 (D.C. Cir. 1980) (criticizing EPA's failure to consider whether the test plants EPA used to support the rule were representative of the whole industry).

Indeed, apparently appreciating that Diversified was differently situated to absorb compliance costs versus smaller marginal well owners, EPA later suggested that marginal well owners who cannot absorb new compliance costs from the Methane Rule could simply *sell* their wells to Diversified or similar firms. TSD at 6-14. Suggesting that owners simply exit the industry due to the cost impact of the Rule gives the game away—conceding the Rule is too costly for most. *See, e.g.,*

*Essex*, 486 F.2d at 433 (BSER requires rules not to be "*exorbitantly costly*") (emphasis added).

Relatedly, in an effort to claim the costs imposed by the Methane Rule are reasonable and that marginal well owners are exaggerating the impact of compliance costs, EPA argues that marginal wells are mostly owned by large companies easily capable of absorbing these costs. Doc. 2059176, p. 24. Yet, during the rulemaking process, EPA itself highlighted that the overwhelming majority—more than 92%—of oil and natural gas wells in the U.S. are owned *by small businesses*. *See* Mot. Ex. H, p. 9 (citing table provided *by EPA* to all Small Business Advocacy Review panel participants in June 2021). Commenters such as MOGA submitted comments and revenue tables explaining how regulatory costs from the Methane Rule would cause typical marginal wells to become uneconomic. *Id.* at 19–21. And EPA also acknowledged in the TSD that there are small owners and operators of marginal wells. TSD at 6-1.

EPA also vaguely claims in its response and in the TSD—without citing any study or data set—that its projections "estimate that, depending on analysis year, roughly 50–60 percent of [marginal well] sites would be classified as small sites for the purposes of fugitive emissions monitoring requirements." *Id.* at 6-8. But these classifications depend on the number of certain of pieces of equipment at a particular well site, and EPA's estimate arbitrarily ignores a broad collection of comments

from industry members and associations across the country explaining that the large majority of marginal well sites require at least *two* pieces or relevant equipment for various reasons, subjecting them to the more stringent and costly requirements applicable to large well sites. *See* Mot., pp. 28–29 (collecting comments).

Second, Opposing Parties rely heavily on a Department of Energy ("DOE") study to support EPA's use of equipment count to categorize well sites for the purposes of establishing fugitive monitoring emissions requirements via optical gas imaging ("OGI") on smaller producing wells. But these arguments ignore the well-founded comments of the Industry Association Petitioners, which explained that EPA irrationally ignored how the relevant information from the DOE study supported the use of Audio-Visual-Olfactory ("AVO") without needing to rely on more expensive OGI monitoring. *See* Mot. Ex. C, 10–17. The types of equipment identified in the DOE study that could result in larger emissions were "predictable sources—tank vents or thief hatches, pneumatic controllers at separator vessels, open valves, or damaged piping" that can be adequately monitored by AVO. *Id*. at 13. This is "particularly clear" for well sites with a throughput of six barrels of oil equivalent ("boe") per day or less. *Id*. And this approach would mean that the regulatory burden on a super majority of "low production wells would be managed in a straightforward program." *Id*. EPA nonetheless ignored these comments and unreasonably moved forward with its course change to impose more expensive OGI

monitoring requirements on these marginal wells. Accordingly, notwithstanding its reliance on the DOE study, EPA's decision is arbitrary and capricious. *See also Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agencies changing course are "obligated to supply a reasoned analysis for the change *beyond* that which may be required when an agency does not act in the first instance") (emphasis added).

*Third*, the measures that Opposing Parties claim EPA has taken to reduce impacts on marginal well owners are mere window dressing. They will not afford the relief Opposing Parties suggest. Imposing less costly compliance options on "single wellhead" or "small well" sites offers little relief for a simple reason: most marginal wells require *at least two pieces* of relevant equipment and are therefore categorized as larger wells. *See* Mot., pp. 28–29. Opposing Parties also argue the Methane Rule affords flexibility to marginal well owners because it allows them to flare associated gas when other options are shown to be not "technically feasible." 89 Fed. Reg. at 16,886. But whether routing to a sales line is "technically feasible" is apparently not based on cost consideration or whether such a line is available because EPA intentionally removed previously proposed language that would have allowed regulatory flexibility when a sales line was "not available." *See* 87 Fed. Reg. 74,702, 74,710 (Dec. 6, 2022). And operators will likely have a difficult time

demonstrating that a sales line could not be built if enough money is spent to make one. Accordingly, this "exception" appears illusory.

## II. Industry Association Petitioners demonstrated irreparable harm, and the other factors favor a stay.

Despite Opposing Parties' contrary arguments, Industry Association Petitioners' declarations demonstrate they will suffer irreparable harm without a stay. Much of Opposing Parties' arguments focus on older wells that are subject to Subpart OOOOc and are thus not yet immediately subject to new regulatory requirements. To be clear, Industry Association Petitioners are not arguing that anticipated state regulations promulgated under Subpart OOOOc and applicable to older wells are already in effect (though older, existing wells on tribal lands owned by Miller Energy and others will face immediate compliance costs). But compliance costs will be immediately imposed for Industry Association Petitioners' wells subject to Subpart OOOOb (*i.e.*, wells constructed, reconstructed, or modified after December 6, 2022). *See* Mot. 20–21 (citing declarations identifying these wells).

These compliance costs will be unrecoverable due to sovereign immunity. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs"); *see also Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *10 (D.D.C. March 12, 2021) (explaining that courts have recognized that damages which are unrecoverable due to sovereign

immunity "can indeed constitute irreparable harm"). Petitioners will also immediately lose valuable property rights as a result of the Methane Rule because the Methane Rule will make well development uneconomical in many instances. *Id*. That is irreparable harm.

Lastly, the other factors also support granting a stay. The interests of American energy resilience and independence outweigh any contrary harms or concerns. Mot., p. 22. And, as the States argue, the public interest in the correct application of the law and in reliable, affordable electricity outweigh any harm EPA can assert. Doc. 2049412, pp. 26–28.[1]

## CONCLUSION

For those reasons, the Court should stay the Methane Rule until it decides on the Petitioners' petitions for review.

[1] EPA also cites *Al-Tamini v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019), and argues Industry Association Petitioners improperly directed the Court to additional arguments in Case No. 24-1059, Doc. No. 2049412, pp. 19–21. This was done only to avoid duplicative arguments, *see* Handbook Part X.A.2, at 38—not to evade word limits or "sandbag" EPA as suggested. And, as in *Al-Tamini*, 916 F.3d at 6, where the Court held that the argument in question was *not* forfeited, EPA certainly had a fair opportunity to respond to these other arguments—a fact EPA implicitly acknowledged by citing its own previously filed brief, which did just that. *See* Dkt. No. 2053091. Even if the Court were to reject this incorporation by reference, Industry Association Petitioners nonetheless also included brief additional argument on these other factors. *See* Mot., p. 22.

Respectfully submitted,

*<u>/s/ Zachary C. Larsen</u>*
Zachary C. Larsen
Clark Hill PLC
215 S Washington Square, Ste. 200
Lansing, MI 48933
(517) 318-3053
zlarsen@clarkhill.com

Anthony P. Campau
Clark Hill PLC
1001 Pennsylvania Ave., NW
Suite 1300 South
Washington, D.C. 20004
(202) 572-8664
acampau@clarkhill.com

*Counsel for MOGA Petitioners*

*<u>/s/ James D. Elliot</u>*
James D. Elliott (DC Bar #46965)
Spilman Thomas & Battle, PLLC
1100 Bent Creek Boulevard, Suite 101
Mechanicsburg, PA 17050
(717) 791-2012
jelliott@spilmanlaw.com

*Counsel for Producer Association Petitioners*

Dated: June 25, 2024

**CERTIFICATE OF COMPLIANCE**

I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,594 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f). I also certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Zachary C. Larsen*
Zachary C. Larsen

Date: June 25, 2024